**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

ROEE KIVITI, et al.,

        *Plaintiffs*,

    v.

MICHAEL R. POMPEO, et al.,

        *Defendants*.

Civil Action No. 8:19-cv-02665-TDC

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT AND
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL AND STATUTORY BACKGROUND ...................................................... 2

    A.     The Immigration and National Act and Defendants' Policy. ................................ 2

    B.     The Kiviti Family .............................................................................................. 3

    C.     Defendants' Refusal To Recognize K.R.K.'s U.S. Citizenship ............................ 5

III.    LEGAL STANDARD ............................................................................................ 7

IV.     ARGUMENT ..................................................................................................... 7

    A.     K.R.K. IS A U.S. CITIZEN, AND HAS BEEN SINCE BIRTH. ......................... 7

        1.    The plain language of Section 301(c) does not require a child to have a biological relationship with both of her married parents ............... 9

        2.    Defendants' reading of Section 301 is inconsistent with the design and structure of the INA. ........................................................ 9

        3.    The INA reflects Congress's intent to keep families together. ............... 11

        4.    Section 301(c) must be understood against the backdrop of the common law spousal presumption of parentage, which does not hinge on biology. ........................................................................ 11

        5.    Courts have repeatedly rejected Defendants' reading of Section 301 ................................................................................................. 13

        6.    Defendants' definitional argument is unavailing. ................................... 16

        7.    Defendants' reliance on the Roman concept of *jus sanguinis* is misplaced. .......................................................................................... 17

        8.    Section 301 must be read to reject Defendants' biological relationship requirement as a matter of constitutional avoidance ............ 19

    B.     DEFENDANTS' POLICY VIOLATES THE PRINCIPLES RECOGNIZED IN *WINDSOR*, *OBERGEFELL*, AND *PAVAN*. ........................ 21

        1.    Birth citizenship under Section 301 is part of the "constellation of benefits" of marriage .............................................................................. 22

        2.    Defendants' application of Section 309 to K.R.K.'s passport application is further proof of Defendants' disregard for Roee and Adiel's marriage and Roee's parentage, in contravention of *Pavan*. ...... 23

    C.     DEFENDANTS' POLICY VIOLATES PLAINTIFFS' DUE PROCESS RIGHTS. ......................................................................................... 24

        1.    Defendants' refusal to recognize K.R.K. as Roee and Adiel's marital child infringes Roee and Adiel's fundamental right to marriage. ........................................................................................... 25

        2.    Defendants infringed Plaintiffs' liberty and fundamental rights to create and be a family. .......................................................................... 25

3.       Defendants' infringement of Plaintiffs' due process rights is
subject to and does not survive strict scrutiny. ........................................ 27

4.       Defendants' policy does not rationally further any legitimate
government interest, and is certainly not narrowly tailored to serve
a compelling one. ..................................................................................... 28

D.       DEFENDANTS' POLICY VIOLATES EQUAL PROTECTION ...................... 31

1.       Defendants treat same-sex couples' marriages as second-class. ............. 31

2.       Defendants' infringement of Plaintiffs' equal protection rights is
subject to heightened scrutiny. ................................................................. 32

a.       Defendants' motion to dismiss should be denied because
Plaintiffs have sufficiently pled intentional discrimination. ........ 35

3.       Defendants' policy does not survive heightened scrutiny or even
rational-basis review. ............................................................................... 35

E.       PLAINTIFFS HAVE STATED A VALID APA CLAIM ................................. 36

V.       CONCLUSION ........................................................................................................ 37

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
    522 U.S. 359 (1998)........................................................................................36, 37

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)....................................................................................................7

*Belyakov v. Med. Sci. & Computing,*
    86 F. Supp. 3d 430 (D. Md. 2015)...........................................................................7

*Boquet v. Boquet,*
    269 So. 3d 895 (La. Ct. App. 2019)........................................................................12

*Bostic v. Schaefer,*
    760 F.3d 352 (4th Cir. 2014) ..............................................................27, 28, 33

*Bowers v. Hardwick,*
    478 U.S. 186 (1986)...................................................................................................34

*Clark v. Martinez,*
    543 U.S. 371 (2005)...........................................................................................19, 20

*Dvash-Banks v. Pompeo,*
    No. 2:18-cv-00523, 2019 WL 911799 (C.D. Cal. Feb. 21, 2019) ...............15, 37

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades*
    *Council,*
    485 U.S. 568 (1988)...................................................................................................19

*Eisenstadt v. Baird,*
    405 U.S. 438 (1972)...................................................................................................32

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016)..............................................................................................37

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009)...................................................................................................19

*Frontiero v. Richardson,*
    411 U.S. 677 (1973)...................................................................................................35

*Golinski v. U.S. Office of Personnel Mgmt.,*
    824 F. Supp. 2d 968 (N.D. Cal. 2012).................................................................34

# TABLE OF AUTHORITIES
### (continued)

*Guyer v. Smith*,
22 Md. 239 (1864) ..................................................................................17

*Hoffman v. Hunt*,
126 F.3d 575 (4th Cir. 1997) .................................................................20

*In re Baby Doe*,
353 S.E.2d 877 (S.C. 1987) ...................................................................12

*In re Christopher YY. v. Jessica ZZ*,
159 A.D.3d 18 (N.Y. App. Div. 3d Dep't 2018) ...................................12

*INS v. St. Cyr*,
533 U.S. 289 (2001)................................................................................19

*Int'l Refugee Assistance Project v. Trump*,
373 F. Supp. 3d 650 (D. Md. 2019)......................................................6, 7

*Jaen v. Sessions*,
899 F.3d 182 (2d Cir. 2018)............................................................ passim

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018)..........................................................................19, 20

*Jimenez v. Weinberger*,
417 U.S. 628 (1974)................................................................................32

*Jordan v. Jackson*,
15 F.3d 333 (4th Cir. 1994) ...................................................................26

*K.D. ex rel. J.D. v. Starr*,
55 F. Supp. 3d 782 (D. Md. 2014) ..........................................................7

*Kitchen v. Herbert*,
755 F.3d 1193 (10th Cir. 2014) .............................................................29

*Kitchen v. Herbert*,
961 F. Supp. 2d 1181 (D. Utah 2013).....................................................34

*L.C. v. M.G.*,
430 P.3d 400 (Haw. 2018) .....................................................................12

*Latta v. Otter*,
771 F.3d 456 (9th Cir. 2014) .................................................................34

*Lawrence v. Texas*,

# TABLE OF AUTHORITIES
(continued)

**Page**

539 U.S. 558 (2003)................................................................................34

*Levy v. Louisiana*,
391 U.S. 68 (1968)................................................................................35

*Loving v. Virginia*,
388 U.S. 1 (1967)................................................................................25

*Massachusetts v. U.S. Dep't of Health & Human Servs.*,
682 F.3d 1 (1st Cir. 2012)................................................................................35

*McLaughlin v. Jones in & for Cty. of Pima*,
401 P.3d 492 (Ariz. 2017)................................................................................12, 21

*McMillian by McMillian v. Heckler*,
759 F.2d 1147 (4th Cir. 1985) ................................................................................12

*Michael H. v. Gerald D.*,
491 U.S. 110 (1989)................................................................................11, 12

*Miller v. Albright*,
523 U.S. 420 (1998)................................................................................2, 18

*N.L.R.B. v. Amax Coal Co.*,
453 U.S. 322 (1981)................................................................................11

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007)................................................................................10

*Nation v. Esperdy*,
239 F. Supp. 531 (S.D.N.Y. 1965) ................................................................................10

*Neder v. United States*,
527 U.S. 1 (1999)................................................................................13

*Nguyen v. I.N.S.*,
533 U.S. 53 (2001)................................................................................18

*Obergefell v. Hodges*,
135 S. Ct. 2584 (2015)................................................................................passim

*Pavan v. Smith*,
137 S. Ct. 2075 (2017)................................................................................passim

*Pedersen v. Office of Personnel Mgmt.*,
881 F. Supp. 2d 294 (D. Conn. 2012)................................................................................34

*Pers. Adm'r of Massachusetts v. Feeney,*
442 U.S. 256 (1979)................................................................35

*Planned Parenthood of Se. Pa. v. Casey,*
505 U.S. 833 (1992)................................................................26

*Russello v. United States,*
464 U.S. 16 (1983)..................................................................9

*Sabra v. Pompeo,*
Case No. 19-cv-2990 (D.D.C.) ..............................................30

*Scales v. INS,*
232 F.3d 1159 (9th Cir. 2000) ...................................... passim

*Sessions v. Morales-Santana,*
137 S. Ct. 1678 (2017)..............................................2, 17, 33, 35

*SmithKline Beecham Corp. v. Abbott Labs.,*
740 F.3d 471 (9th Cir. 2014) ................................................33

*Solis-Espinoza v. Gonzales,*
401 F.3d 1090 (9th Cir. 2005) ........................................11, 14

*Sook Young Hong v. Napolitano,*
772 F. Supp. 2d 1270 (D. Haw. 2011) ...................................11

*Spriggs v. Diamond Auto Glass,*
242 F.3d 179 (4th Cir. 2001) .................................................7

*Stanley v. Illinois,*
405 U.S. 645 (1972)................................................................26

*Thomasson v. Perry,*
80 F.3d 915 (4th Cir. 1996) (en banc) ..................................34

*U.S. Dep't of Agric. v. Moreno,*
413 U.S. 528 (1973)................................................................35

*United States v. Brown,*
748 F.3d 1045 (11th Cir. 2014) .............................................20

*United States v. Nordic Village, Inc.,*
503 U.S. 30 (1992)..................................................................10

*United States v. Simms,*

914 F.3d 229 (4th Cir.) .......................................................................................19

*United States v. Windsor,*
570 U.S. 744 (2013).............................................................................. passim

*Univ. of Tex. Sw. Med. Center v. Nassar,*
570 U.S. 338 (2013).........................................................................................9

*Util. Air Regulatory Grp. v. E.P.A.,*
573 U.S. 302 (2014).......................................................................................37

*Veney v. Wyche,*
293 F.3d 726 (4th Cir. 2002) .........................................................................34

*Washington v. Glucksberg,*
521 U.S. 702 (1997).......................................................................................27

*Waters v. Ricketts,*
48 F. Supp. 3d 1271 (D. Neb. 2015) ..............................................................34

*Weber v. Aetna Casualty & Surety Co.,*
406 U.S. 164 (1972).......................................................................................35

*Windsor v. United States,*
699 F.3d 169 (2d Cir. 2012)...........................................................................33

*Zablocki v. Redhail,*
434 U.S. 374 (1978).......................................................................................32

**STATUTES**

8 U.S.C. § 1101(b) ....................................................................................10, 31

8 U.S.C. § 1101(c) ....................................................................................10, 31

8 U.S.C. § 1401 ................................................................................... passim

8 U.S.C. § 1409 ................................................................................... passim

8 U.S.C. § 1503.................................................................................1, 8, 25, 37

Pub. L. No. 95-432, sec. 3, 92 Stat 1046 (1978)............................................28

**OTHER AUTHORITIES**

Kerry Abrams & R. Kent Piacenti, *Immigration's Family Values*, 100 Va. L. Rev.

629 (2014) .................................................................................................17, 18

Jill Adams, *Paternity testing: Blood types and DNA*,
NATURE EDUCATION 1(1):146 (2008) .................................................................28

Black's Law Dictionary (11th ed. 2019) .................................................................17

Kristin A. Collins, *Illegitimate Borders: Jus Sanguinis Citizenship and the Legal
Construction of Family, Race, and Nation*,
123 Yale L.J. 2134 (2014) ......................................................................18

Kari E. Hong, *Removing Citizens: Parenthood, Immigration Courts, and
Derivative Citizenship*, 28 Geo. Immigr. L.J. 277 (2014) ......................................17

H.R. Rep. No. 85-1199 (1957) ................................................................................10

*Lexico.com*, https://www.lexico.com/en/definition/of ................................................16

*Merriam-Webster Dictionary*,
https://www.merriam-webster.com/dictionary/of ................................................16

*Oxford English Dictionary*
https://www.oed.com/view/Entry/21674;
https://www.oed.com/view/Entry/130549 ............................................................16

# I.     INTRODUCTION

This case is about family: about K.R.K., the infant daughter of two married U.S. citizens, her parents Roee Kiviti and Adiel Kiviti, and whether the United States government can disregard their familial and legal ties by fiat. Pursuant to Section 301(c) of the Immigration and Nationality Act ("INA"), "a person born outside of the United States . . . of parents both of whom are citizens of the United States and one of whom has had a residence in the United States . . . prior to the birth of such person," "shall be [a] national[] and citizen[] of the United States at birth." 8 U.S.C. § 1401(c). K.R.K. is such a person. K.R.K. was born in Canada in 2019 to her intended and only parents, Roee and Adiel, both of whom are U.S. citizens who have resided within the United States.

The State Department wrongfully refused to recognize K.R.K.'s U.S. citizenship. It declined to issue her a passport pursuant to its own extra-textual requirement that there be a biological or "blood relationship" between a child and both of her U.S.-citizen parents in order for citizenship to be conferred under Section 301(c)—a requirement that is contrary to the INA's plain language, overall structure, and purpose of promoting family unity. Requiring a biological relationship between a parent and his marital child for purposes of derivative citizenship is discriminatory and wrong. And, as every court to consider the issue has found, it is also unlawful.

In addition, the policy inflicts grave constitutional harms on each of the Plaintiffs: Defendants disregarded the lawful marriage of Roee and Adiel, ignored the parent-child relationship between Roee and K.R.K., and demeaned Plaintiffs' family. In doing so, Defendants have infringed on Roee and Adiel's constitutionally-protected liberty interest in their marriage, impinged on all Plaintiffs' right to form and be a family, and failed to respect the equality and dignity of all Plaintiffs.

Plaintiffs therefore oppose Defendants' Motion to Dismiss the Complaint (ECF 46) and cross-move for summary judgment on their 8 U.S.C. § 1503(a) claim, their facial due process

claim, and their facial equal protection claim. The Court should declare K.R.K. to be a citizen since birth, set aside Defendants' unlawful actions, enjoin Defendants' discriminatory policy, and order Defendants to issue K.R.K. a U.S. Passport.

## II.   FACTUAL AND STATUTORY BACKGROUND

### A.   The Immigration and National Act and Defendants' Policy.

Persons born outside the United States acquire citizenship at birth only as provided by statute, namely the INA. *See Miller v. Albright*, 523 U.S. 420, 423-24 (1998). The INA sets out the circumstances under which persons born abroad are citizens at birth in two different provisions—Sections 301 and 309, which are codified at 8 U.S.C. §§ 1401 and 1409, respectively—and their application differs depending on whether a child's parents are married or unmarried. Section 301 sets forth categories of persons who "shall be nationals and citizens of the United States at birth," 8 U.S.C. § 1401, and it has long been recognized as applicable to any person whose parents were lawfully married when he or she was born. *See, e.g., Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 (2017) (noting that 8 U.S.C. § 1401 is "[a]pplicable to married couples"). On its face, Section 301 makes no mention of a biological relationship.

By contrast, Section 309 applies only to children "born out of wedlock" and sets forth a number of additional and distinct requirements for citizenship at birth. *See* 8 U.S.C. § 1409. To establish the U.S. citizenship of a child born abroad to an unwed U.S. citizen father, Section 309 requires (among other things) that "a blood relationship between the person and the father is established by clear and convincing evidence." 8 U.S.C. § 1409(a)(1).

Despite the absence of any "blood relationship" requirement in Section 301, the State Department imposes a biological relationship test for issuance of a U.S. passport. Specifically, the Department's internal Foreign Affairs Manual ("FAM") states that to be considered born "in wedlock"—and therefore eligible for U.S. citizenship under Section 301(c)—a child born abroad

must have a biological relationship with both of her married parents. *See* 8 FAM § 304.1-2(c).[1]

The State Department's interpretation of its extra-textual biological relationship requirement has changed over time, even while the statue has not. Prior to 2014, the State Department applied Section 309 to the children born abroad to a gestational but non-genetic mother—*i.e.*, a mother who had used an egg donor—even if she was the child's legal parent. Ex. W, Joint Record ("JR") 125 (166:14-22). Yet in 2014, the State Department changed course. It redefined the extra-textual biological relationship requirement to deem gestational, non-genetic mothers to have a "biological" or "blood relationship" with the child—but *only* if the mother is also the child's legal parent. *See*, *e.g.*, 8 FAM § 301.4(D)(1)(c). This change was not occasioned by any congressional enactment or amendment to the INA. The State Department simply changed its mind. Ex. W, JR132 (243:1-4, 15-20).

### B. The Kiviti Family.

Roee and Adiel Kiviti are U.S. citizens who each resided in the United States prior to their daughter's birth. Ex. A, JR1; Ex. B, JR8; Ex. D, JR18; Ex. E, JR19; Ex. F, JR20; Ex. G, JR21; Ex. H, JR22; Ex. Q, JR86-102; Amended Complaint (ECF 45) ("Complaint" or "Compl.") at ¶¶ 10-11.[2] Roee was born in Israel in 1978. Ex. A, JR1 ¶ 3; Ex. D, JR18; Compl. at ¶ 10. He has lawfully resided in the United States since 1982 and grew up primarily in southern California. Ex. A, JR1 ¶ 3; Ex. E, JR19; Compl. ¶ 10. Roee became a lawful permanent resident in September 1993, and a U.S. citizen in August 2001. Ex. A, JR1 ¶ 3; Ex. E, JR19; Compl. ¶ 10.

Adiel is a U.S. citizen who was born in Israel in 1979. Ex. B, JR8 ¶ 3; Ex. F, JR20; Compl.

---

[1] The Foreign Affairs Manual is available at fam.state.gov. For the Court's convenience, Plaintiffs have also included the cited FAM provisions as Exhibits S-V to the Joint Record.

[2] As this brief addresses both Plaintiffs' motion for partial summary judgment and Defendants' motion to dismiss, Plaintiffs cite to both the Joint Record and the Amended Complaint.

¶ 11. Adiel's application to be a lawful permanent resident was approved in April 2015, and Adiel moved to the United States in May 2015. Ex. B, JR8 ¶ 5; Ex. G, JR21; Compl. ¶ 11. Adiel became a U.S. citizen in January 2019, prior to K.R.K.'s birth. Ex. F, JR20; Compl. ¶¶ 11, 13.

Roee and Adiel began dating in 2011. Ex. A, JR1 ¶ 3; Ex. B, JR8 ¶ 3; Compl. ¶ 40. Before they met, Roee and Adiel both knew that they wanted to have children, and when they got engaged they did so with the hope and understanding that children would be part of their future together. Ex. A, JR2 ¶ 10; Ex. B, JR9 ¶ 10; Compl. ¶ 41. Roee and Adiel married on October 15, 2013, in Santa Barbara, California. Ex. I, JR23; Compl. ¶¶ 12, 41.

When Roee and Adiel were ready to move forward with bringing children into their family, they decided to use assisted reproductive technology ("ART") to bring children into the world. Ex. A, JR2 ¶ 11; Ex. B, JR9 ¶ 11; Compl. ¶ 42. The couple moved forward with a Canadian volunteer gestational surrogate, and eggs provided by a separate donor. Ex. A, JR2 ¶ 11; Ex. B, JR9 ¶ 11; Compl. ¶ 42. Roee and Adiel's son L.R.K. was born in Alberta, Canada in 2016. Ex. K, JR28; Compl. ¶ 43. A Canadian court issued an order finding that Roee and L.R.K. have a biological and genetic relationship, and that both Roee and Adiel are his parents. Ex. J, JR24-26; Compl. ¶ 43. L.R.K.'s Alberta birth certificate correctly identifies Roee and Adiel as his parents. Ex. K, JR28; Compl. ¶ 43. Roee and Adiel subsequently applied for a U.S. passport for their son. Ex. A, JR3 ¶ 19; Compl. ¶ 44. State Department employees did not ask about a biological relationship between L.R.K. and either of his fathers. Ex. A, JR3 ¶ 19; Compl. ¶ 44. The Passport Agency approved the application and issued L.R.K. a U.S. passport. Ex. L, JR29; Compl. ¶ 44.

Roee and Adiel hoped to give their son a younger sibling. Ex. A, JR3 ¶ 21; Ex. B, JR10 ¶ 18; Compl. ¶ 45. Roee and Adiel again decided to move forward with a Canadian volunteer gestational surrogate and eggs provided by a donor. Ex. A, JR3 ¶ 21; Ex. B, JR10 ¶ 18; Compl. ¶ 45. Once again, all parties agreed that Roee and Adiel would be the intended and only parents of

any child born via surrogacy. Ex. A, JR3-4 ¶ 21; Ex. B, JR10 ¶ 18; Ex. M, JR30; Compl. ¶ 45.

Roee and Adiel's daughter K.R.K. was born in Calgary, Canada in 2019. Ex. O, JR83; Compl. ¶¶ 13, 46. On February 28, 2019, the Court of Queen's Bench of Alberta issued a Surrogacy Order finding that "the genetic and biological relationship between Adiel" and" K.R.K. had been "established." Ex. N, JR81-82; Compl. ¶ 47. The court further ordered that both Adiel and Roee are K.R.K.'s only parents. *Id*. Soon after, the Alberta Registrar of Vital Statistics issued K.R.K.'s birth certificate, identifying Roee and Adiel as her parents. Ex. O, JR83; Compl. ¶ 48.

### C. Defendants' Refusal To Recognize K.R.K.'s U.S. Citizenship.

Roee and Adiel returned to the United States with K.R.K. three weeks after her birth, with K.R.K. entering the country on a Canadian passport. Ex. A, JR4 ¶ 29; Ex. B, JR11 ¶ 23; Compl. ¶ 49. Following the same approach they had taken to obtain their son's passport, on May 1, 2019, Roee and Adiel went with K.R.K. to the Los Angeles Passport Agency to apply for a U.S. passport. Ex. A, JR4-5 ¶ 30; Ex. B, JR11 ¶ 24; Compl. ¶ 49. The Kivitis submitted the application, K.R.K.'s birth certificate identifying Roee and Adiel as her parents, Roee and Adiel's marriage certificate, Adiel's U.S. passport, and Adiel's naturalization certificate. Ex. A, JR5 ¶ 31; Ex. B, JR11 ¶ 25; Compl. ¶ 49. They also informed State Department staff that Roee is a U.S. citizen. Ex. A, JR5 ¶ 31; Ex. B, JR11 ¶ 25; Compl. ¶ 49. A State Department employee wrote the word "surrogacy" on the application. Ex. A, JR5 ¶ 31; Ex. B, JR11 ¶ 25; Compl. ¶ 49. The Kivitis were asked to wait. Ex. A, JR5 ¶ 32; Ex. B, JR11 ¶ 26; Compl. ¶ 49. Eventually, a State Department employee informed the Kivitis that the State Department would issue K.R.K. a passport, which would be available for pickup in a few days. Ex. A, JR5 ¶ 32; Ex. B, JR11 ¶ 26; Compl. ¶ 49. They were asked Roee and Adiel to take an oath, which they did, and to pay for K.R.K.'s passport in advance, which they also did. Ex. A, JR5 ¶ 32; Ex. B, JR11 ¶ 26; Compl. ¶ 49.

The next day, Adiel received a telephone call from a State Department attorney who asked

for additional information, including specific details regarding the gestational surrogacy arrangement. Ex. A, JR5 ¶ 33; Ex. B, JR11-12 ¶ 27; Compl. ¶ 50. The attorney also informed the Kivitis that the State Department would evaluate K.R.K.'s U.S. citizenship under Section 309, the statutory provision that applies to children born "out of wedlock." Ex. A, JR5; Ex. B, JR11-12; Compl. ¶ 50. 33. Adiel emailed the attorney a copy of the Canadian court order recognizing Adiel and Roee as K.R.K.'s parents. Ex. P, JR84-85; Compl. ¶ 50.

On July 3, 2019, the State Department denied the application for K.R.K.'s passport. Ex. R, JR103; Compl. ¶ 51. The State Department stated in correspondence:

> [T]he Department requires, among other things, evidence that a child's biological U.S. citizen parent was physically present in the United States prior to the child's birth for the requisite period of time specified in the INA.
>
> A review of the evidence you submitted indicates that Adiel Kiviti, [K.R.K.]'s biological parent was not physically present in the United States for the required period of time. In view of this, [K.R.K.] does not have a claim to U.S. citizenship through Mr. Kiviti. Nor, in the absence of a biological relationship to Roee Ruttenberg Kiviti, does [K.R.K.] have a claim through him. Therefore, a U.S. passport cannot be issued at this time and the application is denied.

Ex. R, JR103; Compl. ¶ 51 & Ex. A.

As the July 3, 2019 letter makes clear, the State Department evaluated K.R.K.'s citizenship under Section 309, the INA provision applicable only to children born "out of wedlock." Had the Department recognized the validity and relevance of Roee and Adiel's marriage, it would have recognized K.R.K. as a marital child and evaluated her citizenship under Section 301(c). But the Department determined that K.R.K. was *not* Roee and Adiel's marital child, and not Roee's child at all. It did not recognize Roee and Adiel's marriage, and deemed the parent-child relationship between Roee and K.R.K. irrelevant merely because he is not biologically related to her. These decisions by are deeply painful and humiliating to Plaintiffs. Ex. A, JR6 ¶ 38; Ex. B, JR13 ¶ 32.

## III.    LEGAL STANDARD

"To defeat a motion to dismiss … the complaint must allege enough facts to state a plausible claim for relief." *Int'l Refugee Assistance Project v. Trump*, 373 F. Supp. 3d 650, 660 (D. Md. 2019) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is plausible when the facts pleaded allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quotation and citation omitted). "The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff." *Id.* "

Summary judgment is appropriate "if the moving party demonstrates there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *K.D. ex rel. J.D. v. Starr*, 55 F. Supp. 3d 782, 787–88 (D. Md. 2014) (citing Fed. R. Civ. P. 56(a)). "In doing so, the Court views the facts in a light most favorable to the nonmoving party, who has the burden of showing that a genuine dispute exists." *Id.* at 788 (citations omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001). "A dispute of material fact is only 'genuine' if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party." *Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 441 (D. Md. 2015).

## IV.    ARGUMENT

### A.    K.R.K. IS A U.S. CITIZEN, AND HAS BEEN SINCE BIRTH.

Section 301 of the INA provides that "a person born outside of the United States . . . of

parents both of whom are citizens of the United States and one of whom has had a residence in the United States . . . prior to the birth of such person," "shall be [a] national[] and citizen[] of the United States at birth." 8 U.S.C. § 1401(c). As a child born of her married parents, both of whom are U.S. citizens, K.R.K. is a citizen at birth under the plain terms of this section.

The facts are undisputed: Roee and Adiel are U.S. citizens who are married to each other, and who both resided in the United States prior to K.R.K.'s birth; K.R.K. was born abroad during Roee and Adiel's marriage; and, K.R.K. is the legal, marital child of Roee and Adiel, her intended and only parents. Ex. A, JR1-3; Ex. B, JR8-10; Ex. D, JR18; Ex. E, JR19; Ex. F, JR20; Ex. G, JR21; Ex. H, JR22; Ex. I, JR23, Ex. M, JR30, Ex. N, JR80-82; Ex. O, JR83; Ex. Q, JR86-102. Based on these facts, pursuant to Section 301(c) of the INA, K.R.K. is and has been a U.S. citizen since her birth.

Defendants nevertheless refuse to recognize K.R.K. as a U.S. citizen because they erroneously graft onto Section 301 a requirement that the children of married U.S. citizens have a "biological" relationship with both of their married parents. This added requirement is contrary to the INA, and has been repeatedly rejected by the courts. Moreover, it categorically disrespects the marriages of same-sex couples, and, by definition, excludes children born abroad to same-sex couples from ever obtaining citizenship-at-birth. This not only harms these families, but also raises serious due process and equal protection concerns. Nothing in Section 301, or any other provision of the INA, suggests that in using the phrase "born . . . of parents" Congress intended to refer only to parents who are both legal *and* biological parents.

The INA empowers this Court to issue a *de novo* declaration that K.R.K. is a U.S. citizen. 8 U.S.C. § 1503(a). Based on the text, structure, and purpose of the INA, and in order to avoid running afoul of constitutional liberty and equality principles, this Court should deny Defendants' motion to dismiss, grant summary judgment on K.R.K.'s Section 1503(a) claim, and declare

K.R.K. to be a U.S. citizen since birth pursuant to Section 301(c) of the INA, with all the rights and privileges of such citizenship.

1. **The plain language of Section 301(c) does not require a child to have a biological relationship with both of her married parents.**

Defendants read into Section 301 a requirement—that a child and both her parents have a biological or "blood relationship"—that is simply not present in the statutory text. Section 301's plain language cannot support this invented prerequisite to citizenship-at-birth; the law says nothing about biology. If it had wanted to do so, Congress knew how to require a genetic or "blood relationship" between a parent and child. The plain text of Section 309—the only other provision of the INA that deals with citizenship at birth—specifies that "a person born out of wedlock" is a U.S. citizen only if several requirements are met, including that "a blood relationship between the person and the [U.S.-citizen] father is established by clear and convincing evidence." 8 U.S.C. § 1409(a)(1). Section 301 contains no such requirement for the children of married U.S. citizens.

This difference is dispositive. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotations omitted). Here, "Congress clearly specified enhanced requirements for proof of parentage in the case of children born out of wedlock" and "the 'textual distinction' between the sections regarding children of married parents and children of unmarried parents is strongly suggestive of a clear Congressional intent to treat the two categories differently on this point." *Jaen v. Sessions*, 899 F.3d 182, 189 (2d Cir. 2018); *see also Scales v. INS*, 232 F.3d 1159, 1164-65 (9th Cir. 2000) (contrasting Sections 301 and 309 and holding that Section 301 does not require a blood relationship).

2. **Defendants' reading of Section 301 is inconsistent with the design and structure of the INA.**

Defendants' grafting of an extra-textual biological relationship requirement onto Section 301 should also be rejected in light of "its inconsistency with the design and structure of the statute as a whole." *Univ. of Tex. Sw. Med. Center v. Nassar*, 570 U.S. 338, 353 (2013) ("Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices."). Section 309(a) incorporates the provisions of Section 301(c), (d), (e), and (g), as applicable, and then further requires that "a blood relationship between the person and the father [be] established by clear and convincing evidence." 8 U.S.C. § 1409(a). The explicit "blood relationship" requirement in Section 309(a) would be superfluous if paragraphs (c), (d), (e), and (g) of Section 301 already required a biological relationship. The Supreme Court has repeatedly "cautioned against reading a text in a way that makes part of it redundant." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007); *see also United States v. Nordic Village, Inc.*, 503 U.S. 30, 36 (1992) (applying the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect").

Other provisions of the INA are consistent with Plaintiffs' reading. Sections 301 and 309 are part of Title III of the INA, which does not define the term "parent" (other than to clarify that it includes a deceased parent), much less define it to mean only biological or genetic parents. *See* 8 U.S.C. § 1101(c)(2). For purposes of Titles I and II of the INA, the term "parent" is defined as "a parent, father, or mother only where the relationship exists by reason of any of the circumstances set forth in subdivision (1) of this subsection." 8 U.S.C. § 1101(b)(2). Subdivision (1), in turn, defines the term "child" to mean "an unmarried person under twenty-one years of age" who is "a child born in wedlock," is a stepchild, or, if not born in wedlock, meets certain criteria, such as, for example, having been "legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile." 8 U.S.C. § 1101(b)(1)(A)-(C). Taken together, Titles I, II, and III reflect the INA's broad approach to the term "parent," and narrow the term's scope

only in the case of non-marital children—a situation not applicable to K.R.K. and others like her.

### 3. The INA reflects Congress's intent to keep families together.

The legislative history of the INA "clearly indicates that Congress intended to provide for a liberal treatment of children and was concerned with the problem of keeping families of United States citizens and immigrants united." H.R. Rep. No. 85-1199, at 7 (1957); *see also Nation v. Esperdy*, 239 F. Supp. 531, 538 (S.D.N.Y. 1965) ("'[T]hese provisions are designed to clarify or adjust existing provisions of law in the interest of reuniting broken families . . . .'" (quoting 103 Cong. Rec. 15,498 (1957) (statement of Sen. John F. Kennedy))).

In rejecting a biological relationship requirement in Section 301, the Ninth Circuit recognized that "[t]he [INA] was intended to keep families together [and] should be construed in favor of family units and the acceptance of responsibility by family members." *Solis-Espinoza v. Gonzales*, 401 F.3d 1090, 1094 (9th Cir. 2005); *see also Sook Young Hong v. Napolitano*, 772 F. Supp. 2d 1270, 1278-79 (D. Haw. 2011) (collecting cases regarding the proposition that "maintenance of family unity and . . . the liberal treatment of children represent well-known goals of the INA"). The State Department's interpretation that Section 301(c) requires proof of a biological relationship with both married parents does exactly the opposite, especially in cases of families headed by same-sex couples such as the Plaintiffs here.

### 4. Section 301(c) must be understood against the backdrop of the common law spousal presumption of parentage, which does not hinge on biology.

In omitting any reference to a biological or blood relationship requirement from Section 301, Congress incorporated the general common law spousal presumption of parentage (sometimes referred to as a "marital presumption," "presumptive parentage," or a presumption of "legitimacy"). The long-standing presumption that every child born during their parents' marriage is the legal child of both spouses, regardless of "blood" ties, forms the essential backdrop against

which the statute's use of the term "parent" must be understood. *See N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322, 329 (1981) ("Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.").

"The presumption of legitimacy was a fundamental principle of the common law." *Michael H. v. Gerald D.*, 491 U.S. 110, 124 (1989) (upholding presumption recognizing married father's parental status even where it was undisputed that he was not the child's biological parent). This spousal presumption of parentage is rooted in the historic respect for marital family units, and is designed to protect both the peace and tranquility of the family, and the child's rights of support and inheritance from both married parents. *Id.* at 123-25. It is incorporated into domestic relations laws across the country, *see*, *e.g.*, *McMillian by McMillian v. Heckler*, 759 F.2d 1147, 1153 (4th Cir. 1985) (noting that marital presumption is applied in "most, if not all" states); *Jaen*, 899 F.3d at 189 (noting states' incorporation of the presumption into their domestic relations laws), and in light of this "universal appli[cation] by the states," has been recognized as an element of federal common law regarding the parentage of marital children. *McMillian*, 749 F.2d at 1153.

More specifically, the marital presumption sets forth that when a child is born into a marriage, both spouses are presumed to be that child's legal parents regardless of biology. *See Michael H.*, 491 U.S. at 124-26. This understanding is reflected in case law across the country applying the presumption even when it is undisputed that only one spouse is a biological parent, including when the spouses are of the same sex. *See*, *e.g.*, *L.C. v. M.G.*, 430 P.3d 400, 410, 412 (Haw. 2018) (non-birth mother married to birth mother presumed to be the child's legal parent; noting that presumption of parentage to is "not restricted to persons that share a biological or genetic link with the child"); *McLaughlin v. Jones in & for Cty. of Pima*, 401 P.3d 492, 497 (Ariz. 2017) (same); *Boquet v. Boquet*, 269 So. 3d 895, 900 (La. Ct. App. 2019), *writ denied*, 274 So. 3d

1261 (La. 2019) (non-birth mother presumed to be parent of child born to same-sex spouse); *In re Christopher YY. v. Jessica ZZ*, 159 A.D.3d 18, 24 (N.Y. App. Div. 3d Dep't 2018) ("As the child was born to respondents, a married couple, they have established that the presumption of legitimacy applies, a conclusion unaffected by the gender composition of the marital couple or the use of informal artificial insemination by donor."); *In re Baby Doe*, 353 S.E.2d 877, 878 (S.C. 1987) (applying common law presumption of parentage to children conceived using donor sperm).

This established common law presumption that, when a child is born into a marriage, the spouses are the child's parents irrespective of their biological relationship to the child, is incorporated into the meaning of "parent" in Section 301. *See Jaen*, 899 F.3d at 189 (Section 301 "incorporates the common law deference to the marital family"). Nothing in the text or context of the INA suggests that Congress intended to overthrow this centuries-old understanding that marital children are the legal children of both spouses. "It is a well-established rule of construction that where Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meanings of these terms." *Neder v. United States*, 527 U.S. 1, 21 (1999) (alterations and quotations omitted). When it enacted the INA, Congress did not suggest—much less dictate—any deviation from the common-law rule that parentage does not turn solely on biology.

For this additional reason, Defendants' policy of reading a biological relationship requirement into Section 301 is contrary to statute.

### 5. Courts have repeatedly rejected Defendants' reading of Section 301.

Defendants' interpretation of the statute is directly contrary to the decisions of every court to consider whether Section 301 requires a biological relationship between a child and both married parents. In *Scales*, the Ninth Circuit held that a child born to a noncitizen mother married to a U.S. citizen man acquired derivative citizenship from his legal father even when it was

undisputed that the U.S. citizen was not the child's biological father. 232 F.3d at 1166.[3] The court stated directly that "[t]here is no requirement of a blood relationship between Petitioner and his citizen father, as there is for an illegitimate child." *Id*. "A straightforward reading" of the "born . . . of parents" language in Section 301, the court reasoned, "indicates . . . that there is no requirement of a blood relationship." *Id*. at 1164. The court contrasted Section 301 with Section 309, which does require a blood relationship between a non-marital child and a U.S. citizen father, but which "d[id] not apply to [Scales] . . . because he was born to parents who were married at the time of his birth." *Id*. Finally, the court in *Scales* explained that "[i]f Congress had wanted to ensure" that a person born of married parents only one of whom was a U.S. citizen "actually shares a blood relationship with an American citizen," "'it knew how to do so.'" *Id*. (quoting *Custis v. United States*, 511 U.S. 485, 492 (1994)). As such, the court refused to defer to the FAM, which so diverged from the statute that it could not be deemed "an interpretation of § 1401." *Id*. at 1165-66.

Five years later, the Ninth Circuit reaffirmed *Scales* in *Solis-Espinoza*, a case in which a child conceived during an extramarital affair between his noncitizen father and a noncitizen woman sought recognition of his birthright citizenship. *Solis-Espinoza*, 401 F.3d at 1091. Stressing the INA's purpose of maintaining family integrity, the court held that Solis-Espinoza derived U.S. citizenship under Section 301 from his father's wife, the U.S. citizen who raised him from birth and was "in every practical sense" the child's mother, notwithstanding the absence of a biological relationship between them. *Id*. at 1094. The court stated plainly that the blood relationship requirement applied only to a non-marital child and did not apply to someone like petitioner "who

---

[3] In *Scales* and other precedent discussed in this section, the child's citizenship claim proceeded under Section 301(g) because one of their married parents was a U.S. citizen while the other was not. Here, K.R.K.'s claim arises under Section 301(c) because both of her married parents are U.S. citizens. Both subsections use the same "born . . . of parents" formulation, and decisions interpreting the language in Section 301(g) are equally applicable to Section 301(c).

was not born 'out of wedlock.'" *Id*. at 1093.

> In every practical sense, [the wife of petitioner's biological father] was petitioner's mother and he was her son. There is no good reason to treat petitioner otherwise. Public policy supports recognition and maintenance of a family unit. The [INA] was intended to keep families together. It should be construed in favor of family units and the acceptance of responsibility by family members.

*Id*. at 1094.

The Second Circuit reached the same conclusion in *Jaen*. The court held that Section 301 imported the "common law meaning of 'parent' . . . [and] therefore incorporated the longstanding presumption of parentage based on marriage" such that the husband of Jaen's mother at the time of his birth was his parent for purposes of Section 301 even though he was not biologically related to Jaen. 899 F.3d at 188. "[T]he INA incorporates the common law meaning of 'parent' into [Section 301(g)], such that a child born into a lawful marriage is the lawful child of those parents, regardless of the existence or nonexistence of any biological link." *Id*. at 185. The court contrasted Sections 301 and 309, noting that, "[t]here is no comparable additional requirement for the establishment of paternity in the section regarding citizenship via *married* parents. Consistent with the common law presumption, paternity is simply assumed in the case of married parents." *Id*. at 189. As in *Scales*, the *Jaen* court rejected the argument that the FAM was entitled to deference. *Id*. at 187 n.4. These directly-on-point decisions confirm that the term parents as used in Section 301 is not limited to biological parents.

In an analogous case involving a child born to a married male same-sex couple through assisted reproductive technology ("ART"), the court held that, "the word 'parents' as used in Section 301(g) is not limited to biological parents and that the presumption of legitimacy that applies when a child is born to married parents—as codified in the INA—cannot be rebutted by evidence that the child does not have a biological tie to a U.S. citizen parent." *Dvash-Banks v.*

*Pompeo*, No. 2:18-cv-00523, 2019 WL 911799, *7 (C.D. Cal. Feb. 21, 2019) (granting summary judgment, issuing a declaration of U.S. citizenship under 8 U.S.C. § 1503(a), and ordering Defendants to issue a passport), *appeal docketed*, No. 19-55517 (9th Cir. May 7, 2019).

### 6. Defendants' definitional argument is unavailing.

Finding no refuge in the ordinary rules of statutory construction or precedent, Defendants resort to a purportedly "textual" argument that defies the plain language of the statute through the use of curated dictionary definitions. Defendants craft the following unsound syllogism: Because "born" is defined as "to be brought forth as offspring" and "of" refers to the origin of a person, to be "born of parents" must mean that the child "originates or derives" from the parents. As such, so the argument goes, Section 301's reference to children "born . . . of parents" necessarily means "biologically related" *to both parents* because a child cannot "originate or derive" from parents unless the child is biologically related to *both*. *See* Memo. in Support of Defendant's Mot. to Dismiss the Complaint (ECF 46-1) ("Def. Memo.") at 20. This simply does not follow.

First, it is *not* the case that a child born using ART does not "originate" or "derive from" the parents who used that technology to bring her into the world, nor that a child cannot be "brought forth as offspring" unless two married individuals have contributed their genetic material to her. The *Oxford English Dictionary*—the same dictionary Defendants cite—also defines "born" as "to come into existence" (Def. I.2(a)), and it further states that "of" "[i]ndicat[es] the ***agent or doer***" (Def. IV.A.), thus supporting an interpretation of "born of . . . parents" as meaning *coming into existence* because of the parents. *See* Born, https://www.oed.com/view/Entry/21674; Of, https://www.oed.com/view/Entry/130549.

Second, the definition of the preposition "of" does not support Defendants' argument. Defendants define "of" as indicating the "person from . . . whom something originates, comes, or is acquired or sought." Def. Memo. at 20. That a child originates from—that is, comes into being

through the actions of—their parents is the *sine qua non* of intentional parenthood, as is the case here. Other dictionaries' definitions support this conclusion. *See*, *e.g.*, Of, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/of (defining "of" as "used as a function word to indicate the cause, motive, or reason"); Of, *Lexico.com*, https://www.lexico.com/en/definition/of (defining "of" as "[i]ndicating an association between two entities, typically one of belonging").

7. **Defendants' reliance on the Roman concept of** *jus sanguinis* **is misplaced.**

Defendants' reliance on the Roman concept of *jus sanguinis* also does not withstand scrutiny. Although the Latin phrase "*jus sanguinis*" literally refers to the "right of blood," *see* Black's Law Dictionary (11th ed. 2019), it is telling that only Section 309 refers to a required "blood relationship" while Section 301 does not. That is because, instead of adopting this Roman concept, the INA created a distinct statutory framework for "derivative citizenship." *See* Kari E. Hong, *Removing Citizens: Parenthood*, *Immigration Courts*, *and Derivative Citizenship*, 28 Geo. Immigr. L.J. 277, 289 (2014) ("Derivative citizenship is the means by which U.S. citizenship is conferred to foreign-born children when certain conditions are met."); *see also*, *e.g.*, *Morales-Santana*, 137 S. Ct. at 1688 (analyzing "claim to citizenship derived from the U.S. citizenship of [the] father"); 8 FAM § 301.9-2 (discussing "acquisition of derivative citizenship").

The historical context of how citizenship has been derived in the United States undermines Defendants' argument. A blood relationship has never been either necessary or sufficient to pass on derivative U.S. citizenship. Historically, derivative citizenship required a *legal* parental relationship, and unmarried men had no such relationship with their biological children. *See Guyer v. Smith*, 22 Md. 239, 249 (1864) (children "not born in lawful wedlock . . . under our law [are] *nullius filii*, and … not within the provisions of [the citizenship act]"); Kerry Abrams & R. Kent

Piacenti, *Immigration's Family Values*, 100 Va. L. Rev. 629, 657 (2014) (under "nineteenth century . . . citizenship laws," "children acquiring citizenship at birth had to be *legitimate*").

At the same time, by contrast, because the law treated a husband as the legal father of a child to whom his wife gave birth, a husband could confer derivative citizenship on his child even if he was not the child's biological father. *See id.* at 658 ("The interaction of the marital presumption of paternity with nineteenth-century courts' interpretations of these early citizenship acts meant that, almost certainly, citizenship sometimes passed from U.S. citizen fathers to foreign-born marital children to whom they were not biologically related. . . . Thus it becomes clear that it was marriage rather than blood that was doing the work in the Acts of 1790, 1802, and 1855."). Put simply, historically speaking, "[m]arriage was the conduit by which a man could transfer citizenship to the children of his wife, whether or not they were his biological children." *Id.*

Thus, although "[d]erivative citizenship for non-marital children of American fathers requires demonstration of a 'blood relationship,'" such "statutory requirement [] does not apply to marital children." Kristin A. Collins, *Illegitimate Borders: Jus Sanguinis Citizenship and the Legal Construction of Family, Race, and Nation*, 123 Yale L.J. 2134, 2223-24 n.353 (2014).

Defendants further cite *Miller v. Albright*, 523 U.S. 420 (1998), and *Nguyen v. I.N.S.*, 533 U.S. 53 (2001), in support of their argument that Section 301 incorporates the concept of *jus sanguinis*. But *Miller* and *Nguyen* were cases involving actual non-marital children who therefore fell within the purview of Section 309 of the INA, not Section 301. *Miller* holds that when parental rights have not been established, requiring blood relationship in Section 309 to ensure that there is reliable proof of that relationship is an important government objective. 523 U.S. at 436. But here, where Section 301 omits any reference to a "blood relationship," the State Department cannot substitute its policy preferences for those chosen by Congress. And no one disputes Roee and Adiel's parental rights. As discussed in Section IV.B.4, *infra*, there is no indicia of fraud or lack

of proof of the parent-child relationship. To the contrary, as Defendants admit, cases involving surrogacy usually have ample medical and legal documentation evidencing the relationship between a child and their parents, including legal documents that usually "detail the various 'parties' intentions with respect to future parental rights." *See* 8 FAM § 304.3-4(b)-(c).

> 8.   **Section 301 must be read to reject Defendants' biological relationship requirement as a matter of constitutional avoidance.**

The text, structure, and purpose of the INA all lead to the same unequivocal conclusion: that the derivative citizenship of a marital child like K.R.K. does not depend on a biological relationship to both married parents. If, *arguendo*, the Court deems Section 301 ambiguous in some way, the canon of constitutional avoidance also weighs in favor of Plaintiffs' reading.

As the Fourth Circuit has stated, "[w]e are obligated to construe a statute to avoid constitutional problems." *United States v. Simms*, 914 F.3d 229, 251 (4th Cir.) (citing *INS v. St. Cyr*, 533 U.S. 289, 300 (2001) (alterations and quotations omitted)), *cert. denied*, 140 S. Ct. 304 (2019). The well-established canon of constitutional avoidance is "an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts." *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) ("[W]hen statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems."). Stated differently, the doctrine of constitutional avoidance directs that "when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail." *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005). And courts should apply it if the proposed reading is "fairly possible," *St. Cyr*, 533 U.S. at 300, "after the application of ordinary textual analysis," *Jennings*, 138 S. Ct. at 842.

Defendants' insertion of a biological relationship requirement into Section 301 to deny K.R.K. derivative citizenship infringes Plaintiffs' due process and equal protection rights. *See* Parts IV.B-D, *infra*. Because Defendants' policy raises grave constitutional concerns, this Court should reject Defendants' proffered interpretation of the INA. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575 (1988) (canon merely calls for a determination that a certain interpretation "would *raise* serious constitutional problems") (emphasis added); *United States v. Brown*, 748 F.3d 1045, 1068 (11th Cir. 2014) (noting, but not resolving, constitutional concerns and adopting interpretation that avoided those concerns). Rejecting Defendants' extrinsic biological relationship requirement would avoid these constitutional questions. *See Clark*, 543 U.S. at 381 (a "chief justification[]" for the canon of constitutional avoidance is "that it allows courts to *avoid* the decision of constitutional questions").

The Fourth Circuit's decision in *Hoffman v. Hunt*, 126 F.3d 575 (4th Cir. 1997), is instructive. In *Hoffman*, anti-abortion activists challenged a North Carolina law "criminalizing the obstruction of access to or egress from health care facilities" under which the activists had been threatened with arrest. *Id.* at 578-79. Noting that a constitutional question need not be reached "if there exists an alternative, nonconstitutional basis for [a] decision," the Fourth Circuit declined to resolve the activists' as-applied constitutional challenge, instead clarifying that the statute did not apply to the activists' conduct. *Id.* at 582 ("Because law enforcement officers exceeded their authority in threatening Plaintiffs with arrest for activities that did not violate [the law at issue], we need not determine whether these threats also contravened the First Amendment."). The Court should similarly adopt Plaintiffs' interpretation of Section 301, and thus avoid deciding the serious constitutional questions otherwise raised. *See Jennings*, 138 S. Ct. at 836.

**B.    DEFENDANTS' POLICY VIOLATES THE PRINCIPLES RECOGNIZED IN *WINDSOR*, *OBERGEFELL*, AND *PAVAN*.**

By refusing to recognize Roee and Adiel's lawful marriage and deeming K.R.K. not to be their marital child, Defendants violate the principles articulated by the Supreme Court in *United States v. Windsor*, 570 U.S. 744 (2013), *Obergefell v. Hodges,* 135 S. Ct. 2584 (2015), and *Pavan v. Smith*, 137 S. Ct. 2075 (2017) (per curiam), which mandate the equal treatment of same-sex couples' marriages, as well as equal access to the full "constellation of benefits" attendant to marriage, *Obergefell*, 135 S. Ct. at 2601. These Supreme Court decisions affirming the equal dignity of same-sex relationships announce that denying legal benefits and protections to same-sex couples based on governmental refusal to treat their marriages in the same way that marriages of different-sex couples are treated violates both due process and equal protection. *See Obergefell*, 135 S. Ct. at 2601; *Windsor*, 570 U.S. at 772-74.

In striking down the so-called Defense of Marriage Act, which barred federal recognition of same-sex couples' marriages, *Windsor* held that it was unconstitutional for the government to carve out same-sex couples from the protections afforded to spouses. 570 U.S. at 772-75. *Obergefell* further held that excluding same-sex couples from marriage—and from the panoply of benefits and protections associated with marriage—unconstitutionally deprived those couples of liberty, equality, and dignity. 135 S. Ct. at 2600-05. The Supreme Court reaffirmed these principles in *Pavan*, stating that "same-sex couples, no less than opposite-sex couples, *must have access*" to the full array of rights related to marriage. 137 S. Ct. at 2078 (emphasis added). These decisions explain that equal protection and due process are "interlocking" protections that both separately and together prevent the government from denying legal benefits and protections to same-sex couples. *See Obergefell*, 135 S. Ct. at 2601, 2604; *Windsor*, 570 U.S. at 772-74.

As such, any federal law, regulation, or policy that deprives married same-sex couples of

that full range or protections or treats their marriages as "second-class . . . raises a most serious question under the Constitution's Fifth Amendment." *Windsor*, 570 U.S. at 769-70; *see also Pavan*, 137 S. Ct. at 2078 (finding unconstitutional a state statute under which a different-sex spouse who was a non-biological parent would be named a parent on a marital child's birth certificate but a same-sex spouse would not be); *McLaughlin*, 401 P.3d at 494 (extending a statutory presumption of paternity to a spouse of the same sex because "presumptive parentage" was part of the "constellation of benefits" linked to marriage). Because marriage's function in "safeguard[ing] children and families" is one reason that the Constitution protects the right to marry, *Obergefell*, 135 S. Ct. at 2600, any government conduct that deprives married same-sex couples and their children of those protections is unconstitutional. *Id.* at 2601-02.

### 1. Birth citizenship under Section 301 is part of the "constellation of benefits" of marriage.

Congress specifically created separate requirements for the acquisition of U.S. citizenship at birth for children born to married people and children born to unmarried people. Citizenship under Section 301 *without the added burdens imposed by Section 309* is not a mere "right granted by Congress," Def. Memo. at 15; it is part of the "constellation of benefits that [Congress] ha[s] linked to marriage," and any law or policy that restricts the access of married, same-sex couples to that statutory right raises due process, liberty, and equality concerns. *Obergefell*, 135 S. Ct. at 2601; *Pavan*, 137 S. Ct. at 2078. Under Congress's statutory scheme, all children born abroad to married, U.S.-citizen parents, at least one of whom "has had a residence in the United States or one of its outlying possessions[] prior to the birth of [the child]," are treated alike—they all are citizens at birth. 8 U.S.C. § 1401(c).

It would be unconstitutional for the government to expressly exclude married same-sex couples and their children from the scope of Section 301, just as it may not expressly exclude them

from the other "rights, benefits, and responsibilities" of civil marriage that help to keep those families intact. *Obergefell*, 135 S. Ct. at 2600-01. So too is it unconstitutional for the government to bring the same exclusion in through the backdoor by requiring both married parents to have a biological relationship to the child—a requirement not imposed by statute and one that Plaintiffs and families like theirs can never satisfy. *Pavan*, 137 S. Ct. at 2078.

But that is exactly what Defendants have tried to do. Defendants' policy ignores Congress's determination that, when a child is the legal, marital child of a married couple, no further information of parentage is required. The policy improperly withholds this benefit from the children of married same-sex couples, and in particular the children of all male same-sex couples, who, under the policy, can never qualify for citizenship under Section 301. 8 FAM §§ 301.4-1(D)(1)(c), 304.1-2(c). Defendants' policy unconstitutionally "impose[s] restrictions and disabilities" on same-sex couples' valid marriages, instructing them and their children "that their marriage is less worthy than the marriages of others." *Windsor*, 570 U.S. at 768, 775.

### 2. Defendants' application of Section 309 to K.R.K.'s passport application is further proof of Defendants' disregard for Roee and Adiel's marriage and Roee's parentage, in contravention of *Pavan*.

By treating K.R.K. as a non-marital child, Defendants improperly treated Roee and Adiel as "unmarried for the purpose of federal law, thus diminishing the stability and predictability of basic personal relations the State has found it proper to acknowledge and protect," *Windsor*, 570 U.S. at 772, and disregarded the parentage rights and protections that flow from their marriage.

Moreover, Defendants ignore that K.R.K. is the marital child of Roee and Adiel. Roee and Adiel intentionally brought K.R.K. into this world, and they are not only her legal parents, but also the only parents she has ever known. Ex. A, JR4; Ex. B, JR10-11; Ex. N, JR80-82; Ex. O, JR83. Both of K.R.K.'s married parents are U.S. citizens, and as the child of their marriage, her citizenship at birth flows from each of them. Defendants' myopic focus on whether she has a

biological relationship with Roee, untethered to the INA, undermines their marriage and the reality of their marital family, in violation of the Fifth Amendment. *See Obergefell*, 135 S. Ct. at 2600 (depriving children of same-sex couples the "recognition, stability, and predictability marriage offers" causes them to "suffer the stigma of knowing their families are somehow lesser.").

The Supreme Court's decision in *Pavan* is particularly instructive here. *Pavan* involved an Arkansas law under which a woman's different-sex spouse would be named as a parent on her child's birth certificate, even when the spouse had no biological relationship to the child, but a woman's same-sex spouse would *not* be named on a child's birth certificate. 137 S. Ct. at 2076-77. In summarily reversing the state court, the Court held that such "differential treatment infringes *Obergefell*'s commitment to provide same-sex couples 'the constellation of benefits that the States have linked to marriage.'" *Id*. at 2077 (quoting *Obergefell*, 135 S. Ct at 2601). Because birth certificates were "use[d] . . . to give married parents a form of legal recognition that is not available to unmarried parents," the Court concluded, the disparate treatment of same-sex couples was unconstitutional. *Id*. at 2078-79. Here, Section 301 of the INA is similarly tied to marriage. The benefits of Section 301(c) cannot be made available to different-sex couples and their children but withheld from same-sex couples and their children without violating the Fifth Amendment.

In enacting Section 301(c), Congress granted birthright citizenship to children born abroad to married, U.S.-citizen couples who satisfied certain preconditions. In doing so, Congress linked the governmental benefit granted in Section 301(c) to marriage, and Defendants' policy and conduct violates the Fifth Amendment, pursuant to *Obergefell* and *Pavan*.

### C. DEFENDANTS' POLICY VIOLATES PLAINTIFFS' DUE PROCESS RIGHTS.

Defendants have ignored Roee and Adiel's lawful marriage, deemed their daughter not to be their marital child, and treated Roee and K.R.K. as legal strangers. In short, they have treated

the Kiviti family as if they were not a family at all. By doing so, Defendants have demeaned Plaintiffs; deprived them of equal dignity; violated Roee and Adiel's fundamental right to marry and attendant, protected liberty interests in their marriage; and, violated all Plaintiffs' liberty and fundamental rights to be recognized as a family, including the rights to family privacy, integrity, and association. As discussed above, Plaintiffs urge this Court to rule that K.R.K. is a birthright citizen pursuant to 8 U.S.C. § 1503, thus avoiding the serious constitutional issues raised by Defendants' policy and conduct. However, should the Court determine that it must reach the merits of Plaintiffs' due process claims, the Court should find that, on its face, Defendants' policy and conduct are unlawful, discriminatory, and in violation of the Due Process clause.

### 1. Defendants' refusal to recognize K.R.K. as Roee and Adiel's marital child infringes Roee and Adiel's fundamental right to marriage.

The right to marry is a fundamental right protected under constitutional due process guarantees. *See*, *e.g.*, *Obergefell*, 135 S. Ct. at 2601-02; *Loving v. Virginia*, 388 U.S. 1, 12 (1967). By disregarding Roee's and Adiel's marriage and treating K.R.K as a non-marital child, Defendants have impermissibly infringed upon Roee and Adiel's fundamental right to marriage. *See* Part IV.B, *supra*.

### 2. Defendants infringed Plaintiffs' liberty and fundamental rights to create and be a family.

In addition to burdening Roee and Adiel's fundamental right to marriage, Defendants' policies and unlawful conduct infringe Plaintiffs' fundamental rights to form and be a family. "[C]hoices concerning . . . family relationships, procreation, and childrearing," are "among the most intimate that an individual can make." *Obergefell*, 135 S. Ct. at 2599. These rights are intertwined with the right to marry to make "a unified whole: The right to 'marry, establish a home and bring up children.'" *Id.* at 2600 (quotes and alteration omitted). This collective set of fundamental rights is violated by laws, regulations, and policies that "humiliate[] . . . children . . .

being raised by same-sex couples and . . . make[] it even more difficult for the children to understand the integrity and closeness of their own family." *Windsor*, 570 U.S. at 772. Defendants' insertion of a biological relationship requirement into Section 301 to deny birth citizenship to children like K.R.K. violates the fundamental right to form a family of married same-sex parents and their children.

In addition, by ignoring K.R.K.'s legal relationship with one of her two parents, Roee, Defendants infringe upon a "sacrosanct" bond, namely, "the relationship between parent and child." *See Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir. 1994). But such parent-child relationships are "inviolable except for the most compelling reasons." *Id.* Indeed, the Supreme Court has recognized infringements of these relationships as cognizable harms of a constitutional magnitude. *See Stanley v. Illinois*, 405 U.S. 645, 647-48 (1972).

Defendants have invaded the protected liberty interests of Plaintiffs and other families like them in violation of the Fifth Amendment. The fundamental right to decisional privacy protects both parents' and children's interests in keeping private the intimate decisions about procreation that helped to create the family. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992). These protections extend to the childbearing and childrearing decisions and deliberations of all families, including those headed by same-sex couples. *Windsor* at 772. Congress directs Defendants to respect the decisional privacy of families with married U.S.-citizen parents by applying Section 301(c) to any person whose parents were lawfully married when the person was born. Defendants ignore Congress's direction as a matter of policy, and routinely subject same-sex couples to the kind of invasive questioning Roee and Adiel faced regarding the intimate choices they made leading up to their child's conception and birth. While Defendants claim to presume that "[c]hildren born in wedlock are . . . the issue of that marriage," 8 FAM § 301.4-1(D)(1)(d), they *never* extend that presumption to families like Plaintiffs' family. Put simply,

Defendants' policy is improper because it substantially burdens all Plaintiffs' fundamental rights to form and be a family by unnecessarily invading their privacy.

### 3. Defendants' infringement of Plaintiffs' due process rights is subject to and does not survive strict scrutiny.

Due process "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). As such, Defendants' infringement of Plaintiffs' fundamental rights and liberty interests is subject to strict scrutiny under the Fifth Amendment's Due Process Clause. *Bostic v. Schaefer*, 760 F.3d 352, 375 (4th Cir. 2014) ("Under both the Due Process and Equal Protection Clauses, interference with a fundamental right warrants the application of strict scrutiny."). All lawful marriages, whether between people of different sexes or of the same sex, are "firmly . . . within the ambit of the Due Process Clauses' protection." *Id.* at 374. As explained above, governmental action that denies married, same-sex couples access to the "constellation of benefits" associated with marriage significantly burdens the fundamental right to marry. *Obergefell*, 135 S. Ct. at 2601-02; *Pavan*, 137 S. Ct. at 2078. It also interferes with their liberty interests to form and be a family.

When a governmental action or policy infringes upon "'fundamental' liberty interests *at all*, no matter what process is provided," it must be "narrowly tailored to serve a compelling interest." *Washington*, 521 U.S. at 721. Because Defendants' policy significantly interferes with Plaintiffs' fundamental rights and protected liberty interests, Defendants must demonstrate that their policy satisfies this standard, and "they must rely on the laws' 'actual purpose[s]' rather than hypothetical justifications" in doing so. *Bostic*, 760 F.3d at 377 (quoting *Shaw v. Hunt*, 517 U.S. 899, 908 n. 4 (1996)). Defendants have not met—and cannot meet—this burden.

Though Defendants acknowledge (as they must) that a policy that infringes fundamental liberty interests must be narrowly tailored to serve a compelling state interest, they do not advance

any rationale pursuant to which their policy would survive such strict scrutiny. Def. Memo. at 14. Instead, Defendants suggest that the right at issue is an "individual's right to successfully apply for a U.S. passport on behalf of a child who is born abroad and is not the citizenship-conferring individual's biological child," and then argue that rational basis review applies. *Id.* at 15-16. Defendants' straw-man argument is unavailing, and Defendants have the burden to justify their substantial infringement of Plaintiffs' fundamental rights to marry and to form and be a family. *Bostic*, 760 F.3d at 377. They cannot do so. In fact, Defendants' policy would be void as unconstitutional even under rational-basis review.

### 4. Defendants' policy does not rationally further any legitimate government interest, and is certainly not narrowly tailored to serve a compelling one.

Ensuring a biological relationship between a child born abroad and their citizenship-conferring parent cannot serve as a governmental interest when that policy contravenes Congressional intent. *See* Section IV.A.1, *supra*. Defendants point out the uses of genetic testing in justifying their extra-textual biological relationship requirement. But reliable DNA testing was not available when the INA was passed in 1952, or when Defendants settled on their allegedly "longstanding interpretation" of Section 301. *See, e.g.,* Jill Adams, *Paternity testing: Blood types and DNA*, NATURE EDUCATION 1(1):146 (2008) ("The process of DNA fingerprinting was developed by Alec Jeffreys in 1984, and it first became available for paternity testing in 1988."). Although Congress has repeatedly amended the INA, the language of what is now Section 301(c) is identical to the language of Section 301(a)(3) of the INA as originally adopted in 1952. *See* Immigration and Nationality Act, Pub. L. No. 82-414, § 301(a)(3), 66 Stat. 163 (1952) (codified at 8 U.S.C. § 1401(c) (2012)); Pub. L. No. 95-432, § 3, 92 Stat. 1046 (1978) (re-designating paragraphs (a)(1) to (a)(7) as subsections (a) through (g), respectively). Thus, whatever the value of genetic testing may be in cases where the legal parent-child relationship is genuinely in doubt,

neither history nor modern science supports the argument that Congress intended that citizenship turn only on certain biological relationships, regardless of established legal relationships.

Moreover, Defendants' own policies and actions undermine any purported interest in ensuring a biological relationship between a child born abroad and their citizenship-conferring parent. Defendants take the position that a parent has a "biological" relationship with their child if they contributed genetic material. 8 FAM § 301.4-1(D)(1)(c); Ex. W, JR126 (173:19-25-174:1-5); *cf.* Def. Memo at 5 ("Genetic relationships are the usual form of biological relationship between parents and children."). Yet in 2014, Defendants created an exception to this rule through pretense, one where they consider the *non-genetic* gestational mother of a child, if she is the child's legal parent, to be "biologically related" to the child. 8 FAM §§ 301.4-1(D)(1)(c), 304.3-1(a).[4] Defendants cannot claim an interest in ensuring a biological relationship between a child born abroad and their citizenship-conferring parent when they already recognize some parent-child relationships that do not have a "blood relationship" as sufficient to confer derivative citizenship. And "[t]he absence of narrow tailoring is often revealed by such under-inclusiveness." *Kitchen v. Herbert*, 755 F.3d 1193, 1221 (10th Cir. 2014).

Further, an interest in preventing fraud is insufficient to justify Defendants' policy. First and foremost, the State Department has admitted under oath that the challenged policy was not adopted to prevent or deter fraud. Ex. W, JR137 (317:2-8). Second, as a practical matter, the State Department routinely relies on documentary evidence to establish parentage—documentary evidence they admit there is no shortage of in cases involving ART. In cases of surrogacy, Defendants recognize that there is ample medical and legal documentation evidencing the

---

[4] The exception does not reflect a change in the INA; rather the Department simply "changed its mind." Ex. W, JR132 (243:15-20); *see also* Ex. W, JR125 (166:14-22); Ex. X, JR146 (183:4-18); Ex. Y, JR150 (84:7-12).

relationship between the child and her parents, including legal documents that usually "detail the various parties' intentions with respect to future parental rights." *See* 8 FAM § 304.3-4(b)-(c). Here, not only does K.R.K.'s birth certificate list Roee and Adiel as her only parents, but also the Surrogacy Order issued by the Court of Queen's Bench of Alberta declares Adiel and Roee to be K.R.K.'s only parents, among other documentary evidence. Ex. N, JR80-82; Ex. O, JR83. Defendants are amply able to assess parentage and prevent fraud based on this type of evidence. The FAM lists birth certificates, surrogacy contracts, entry/exit stamps in passports, airline/hotel receipts, sworn statements, photographs, and mementos as typical evidence it looks to establish parentage. *See*, *e.g.*, 8 FAM §§ 304.1-4, 304.3-4. Put simply, it is not that hard for the State Department to undertake a fraud-prevention inquiry. And Defendants admit, "a biological-relationship requirement is not a failsafe means of preventing" fraud. Def. Memo. at 23.

Defendants argue that the biological relationship requirement is necessary to prevent fraud because of cases like *Sabra v. Pompeo*, Case No. 19-cv-2990 (D.D.C.). *See* Def. Memo. at 24. Again, Defendants' sworn testimony forecloses this assertion. And in any event, *Sabra*, a pending case in which no merits decision has been made, is clearly and easily distinguishable. In *Sabra*, the State Department contests the validity of the parent-child relationship. That is not the case here.

Lastly, Defendants cannot justify their policy based on some concern about reliance of foreign parentage laws. The INA already recognizes the validity of parent-child relationships established under foreign law. *See* 8 U.S.C. § 1101(c)(1) (defining "child" as including a child whose parentage was established under the law of either the child's or the father's residence or domicile "whether in the United States or elsewhere"); 8 U.S.C. § 1101(b)(1)(C) (recognizing parentage established under foreign law). Defendants' suggestion that recognizing legal but non-biological parent-child relationships is a radical, foreign idea ignores the language of the INA, as well as the presumption of parentage found in the common law and the law of every state.

**D.    DEFENDANTS' POLICY VIOLATES EQUAL PROTECTION.**

Defendants' harmful and demeaning denial of K.R.K.'s birthright citizenship, of Roee and Adiel's marriage, and of all Plaintiffs' family unit also violates the equal protection component of the Fifth Amendment. Defendants have treated the marriages of same-sex couples as second class, discriminated against Plaintiffs on account of Roee and Adiel's sexual orientation and sex, and discriminated against K.R.K. based on the circumstances of her birth. Should the Court determine that it must reach the merits of Plaintiffs' equal protection claims rather than exercising constitutional avoidance, because "[t]he Constitution grants [Plaintiffs] th[e] right" to "equal dignity in the eyes of the law," *Obergefell*, 135 S. Ct. at 2608, the Court should hold that Defendants' inherently discriminatory policy is unconstitutional on its face.

### 1.    Defendants treat same-sex couples' marriages as second-class.

Defendants treat K.R.K. as the non-marital child of only Adiel, and disregard Roee and Adiel's marriage, including by refusing to apply the marital presumption of parentage to same-sex couples. By doing so, Defendants treat Roee and Adiel's marriage, as well as the marriages of other same-sex couples, as second-class. This demeans, stigmatizes, and denies equal dignity to same-sex couples and their children.

Defendants' policies "identify a subset of state-sanctioned marriages and make them unequal," *Windsor*, 570 U.S. at 772, and as such, deny Plaintiffs equal protection. Defendants' policies thus "deprive same-sex couples of the benefits and responsibilities that come with the federal recognition of their marriages" and "impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States." *Id.* at 770. Defendants' policy favors the marriages of different-sex couples while presuming the invalidity of (and failing to afford equal dignity to) those same relationships between same-sex couples and their children. This biological relationship requirement not only

subjects every married same-sex couple to an invasive inquiry about how their children came into the world, but also treats the marital children of same-sex couples as ineligible for citizenship-at-birth under Section 301(c).

While some different-sex couples who disclose that they have used ART to create their children may also be wrongly treated as unmarried couples, and some gestational, non-biological mothers might be rightfully treated as married to their biological-mother spouses, these rare exceptions to the discriminatory rule do not permit the State Department's policy to pass constitutional muster. Under Defendants' policy, the application of every married, same-sex couple for recognition of their child's citizenship (*and not* the application of every married, different-sex couple) will be subject to additional review, whether or not the parents are ultimately deemed to satisfy the exception. This additional review, together with the background norm that governmental actions that deny "same-sex couples . . . all the benefits afforded to opposite-sex couples" violate constitutional equal protection principles because of the "long history of disapproval" of same-sex relationships renders Defendants' policy facially discriminatory. *See Obergefell*, 135 S. Ct. at 2604. This kind of over- and under-inclusiveness is constitutionally fatal. *Jimenez v. Weinberger*, 417 U.S. 628, 637 (1974); *Zablocki v. Redhail*, 434 U.S. 374, 390 (1978); *Eisenstadt v. Baird*, 405 U.S. 438, 454 (1972).

### 2. Defendants' infringement of Plaintiffs' equal protection rights is subject to heightened scrutiny.

Courts "are required by *Windsor* to apply heightened scrutiny to classifications based on sexual orientation for purposes of equal protection." *See SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 484 (9th Cir. 2014); *see also Windsor v. United States*, 699 F.3d 169, 181-82 (2d Cir. 2012) (analyzing sexual orientation as a "quasi-suspect class"), *aff'd*, 570 U.S. 744

(2013).[5] Tellingly, the *Pavan* court applied heightened scrutiny (albeit without saying so explicitly) in rejecting the State of Arkansas's proposed justification for its birth-certificate law, 137 S. Ct. at 2078—something it would not have done on rational-basis review. *Bostic*, 760 F.3d at 377. A classification subject to heightened scrutiny "must substantially serve an important governmental interest *today*, for 'in interpreting the [e]qual [p]rotection [guarantee], [we have] recognized that new insights and societal understandings can reveal unjustified inequality . . . that once passed unnoticed and unchallenged." *Morales-Santana*, 137 S. Ct. at 1690 (quoting *Obergefell*, 135 S. Ct. at 2603). As discussed above, Defendants' policy discriminates against Plaintiffs on the basis of Adiel's and Roee's sexual orientation.

The State Department's extremely rare exception for a non-genetic gestational mother, who is also the legal parent of the child, 8 FAM § 304.3-1(a), does not render the broader policy constitutional. The exception is just that, an exception to the general biological relationship requirement, which *by definition* treats the marital children of same-sex couples as ineligible for citizenship under Section 301(c). To the contrary, the exception is proof that the biological relationship requirement has no basis in the text and structure of the INA.

Defendants' policy also discriminates on the basis of sex. Laws that treat different-sex and same-sex couples disparately "constitute gender discrimination both facially and when recognized, in their historical context, both as resting on sex stereotyping and as a vestige of the sex-based legal rules once imbedded in the institution of marriage." *Latta v. Otter*, 771 F.3d 456, 490 (9th

---

[5] There is no controlling law in this Circuit regarding the appropriate level of scrutiny for classifications based on sexual orientation, as the Fourth Circuit's only decisions to address the issue, *Thomasson v. Perry*, 80 F.3d 915 (4th Cir. 1996) (en banc), and *Veney v. Wyche*, 293 F.3d 726 (4th Cir. 2002), relied on *Bowers v. Hardwick*, 478 U.S. 186 (1986). These decisions were necessarily abrogated when the Supreme Court overruled *Bowers* in *Lawrence v. Texas*, 539 U.S. 558, 578 (2003). *See Pedersen v. Office of Personnel Mgmt.*, 881 F. Supp. 2d 294, 312 (D. Conn. 2012); *Golinski v. U.S. Office of Personnel Mgmt.*, 824 F. Supp. 2d 968, 984 (N.D. Cal. 2012).

Cir. 2014) (Berzon, J., concurring); *see also Waters v. Ricketts*, 48 F. Supp. 3d 1271, 1281 (D. Neb. 2015) (a law "that mandates that women may only marry men and men may only marry women facially classifies on the basis of gender"), *aff'd on other grounds*, 798 F.3d 682 (8th Cir. 2015); *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1206 (D. Utah 2013) (finding that Utah's marriage laws prohibiting "a man from marrying another man," but not "from marrying a woman," classify based on sex), *aff'd on other grounds*, 755 F.3d 1193 (10th Cir. 2014). And "[l]aws granting or denying benefits 'on the basis of the sex of the qualifying parent,' . . . differentiate on the basis of gender, and therefore attract heightened review under the Constitution's equal protection guarantee." *Morales-Santana*, 137 S. Ct. at 1689.

Defendants' policy also penalizes children for the circumstances of their birth by denying them important rights and protections—a policy that is "illogical and unjust" and subject to heightened scrutiny. *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 175-76 (1972). "[T]he Equal Protection Clause does enable [the court] to strike down discriminatory laws relating to status of birth where—as in this case—the classification is justified by no legitimate state interest, compelling or otherwise." *Id.* at 176. It is "invidious to discriminate against" the marital children of same-sex couples "when no action, conduct, or demeanor of theirs" is relevant to the conferral of citizenship by their citizen parents. *Levy v. Louisiana*, 391 U.S. 68, 72 (1968). And "imposing disabilities on the [] child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing." *Weber*, 406 U.S. at 175.

The fact that Defendants' policy discriminates against married same-sex couples and their children on the bases of sexual orientation, sex, and the circumstances of their children's birth is enough to conclude that Plaintiffs have established a valid equal protection claim. "Certain classifications . . . in themselves supply a reason to infer antipathy." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979); *see also Obergefell*, 135 S. Ct. at 2604 (teaching that the

"long history of disapproval" of same-sex relationships creates a background norm that state actions that deny "same-sex couples . . . all the benefits afforded to opposite-sex couples" likely violate constitutional equal protection principles); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 537 (1973). This includes classifications based on sex, *Frontiero v. Richardson*, 411 U.S. 677, 686-87 (1973), and sexual orientation, *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 11 (1st Cir. 2012).

### a.  Defendants' motion to dismiss should be denied because Plaintiffs have sufficiently pled intentional discrimination.

With respect to the Court's evaluation of Defendants' motion to dismiss, Plaintiffs have plausibly pled intentional discrimination by alleging, on information and belief, that "the children of married different-sex parents are not routinely classified as non-marital children and subjected to the citizenship requirements of Section 309, even when those children are not, in fact, biologically related to both parents." Doc. 45 at ¶¶ 33, 82 (same); *accord id.* ¶ 30 ("only the children of different-sex couples benefit from [the] presumption [of legitimacy]"). These allegations are even more plausible in light of (a) consular officers' unfettered discretion to decide whether "doubt [has] arise[n] that the U.S. citizen 'parent' is biologically related to the child," and (b) consular officer's reluctance "to ask different-sex parents who are identified as legal parents (*e.g.*, on a birth certificate) if their child is, in fact, biologically related to both legal parents." *Id.* ¶¶ 31-32; 8 FAM § 301.4-1(D)(1)(d).

### 3.  Defendants' policy does not survive heightened scrutiny or even rational-basis review.

For the reasons stated above in Part IV.B.4, *supra*, Defendants' incorporation of an extra-textual biological relationship requirement into Section 301(c) fails to rationally further any legitimate government interest, let alone be substantially related to an exceedingly persuasive justification. Because the policy at issue here implicates fundamental rights, protected liberty

interests, and suspect classifications, it is Defendants' burden to articulate how their policies and actions are narrowly tailored to further a compelling governmental interest. There is no plausible rationalization of how these policies and actions meet any of these tests.

### E. PLAINTIFFS HAVE STATED A VALID APA CLAIM.

Federal administrative agencies are required to engage in "reasoned decision making." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374–75 (1998). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* at 374. Here, Defendants fail on both counts, and their motion to dismiss must be denied as to Plaintiffs' APA claim.

First, Defendants acted beyond their lawful authority by grafting onto the INA a biological relationship requirement that is counter to the statute's text, structure, and purpose. "[A]gencies must operate 'within the bounds of reasonable interpretation,'" and a "reasonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 321 (2014) (citations omitted). As shown above, Defendants' interpretation is unreasonable and thus "does not merit deference." *Id.*; *see also Jaen*, 899 F.3d at 187 n.4; *Scales*, 232 F.3d at 1165-66.

Second, Defendants' policy and actions are arbitrary and capricious. Not only do they fail to rationally further any legitimate government interest, *see* Section IV.D, *supra*, Defendants cannot rationally explain the redefinition of their biological/blood relationship requirement to encompass non-genetic, gestational mothers. "An unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quotations omitted).

The INA empowers this Court to issue a *de novo* declaration that K.R.K. is a U.S. citizen, and to require Defendants to issue her a U.S. passport. *See Dvash-Banks*, 2019 WL 911799, at *8.

However, the Section 1503 claim does not address the harms Defendants' policy has inflicted and continues to inflict on Roee and Adiel, and Plaintiffs seek additional relief beyond that provided by Section 1503(a). Defendants' request to dismiss Plaintiffs' APA claims should be denied.

## V.  CONCLUSION

Because Defendants' policy and actions run counter to the text, structure, and purpose of the INA, and also infringe Plaintiffs' constitutional rights, the Court should grant Plaintiffs' Motion for Partial Summary Judgment and deny Defendants' Motion to Dismiss the Complaint.

Dated: January 10, 2020

Respectfully submitted,

*/s/ Clara Kollm*

Omar Gonzalez-Pagan*
Karen L. Loewy*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: (212) 809-8585
Facsimile: (212) 809-0055
ogonzalez-pagan@lambdalegal.org
kloewy@lambdalegal.org

Aaron C. Morris*
IMMIGRATION EQUALITY
40 Exchange Place, Suite 1300
New York, New York 10005-2744
Telephone: (212) 714-2904
amorris@immigrationequality.org

*Admitted *pro hac vice*

Susan Baker Manning*
Eleanor Pelta*
Clara Kollm (MD Bar No. 19865)
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-3000
susan.manning@morganlewis.com
eleanor.pelta@morganlewis.com
clara.kollm@morganlewis.com

John A. Polito*
Christie P. Bahna*
MORGAN LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, California 94105
Telephone: (415) 442-1000
john.polito@morganlewis.com
christie.bahna@morganlewis.com

Jacquelynne M. Hamilton*
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 963-5000
jacquelynne.hamilton@morganlewis.com

*Attorneys for Plaintiffs*