## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

ROEE KIVITI,
ADIEL KIVITI and
K.R.K.,

      Plaintiffs,

      v.

MICHAEL POMPEO,
*in his Official Capacity as Secretary of State*,
and
U.S. DEPARTMENT OF STATE,

      Defendants.

Civil Action No. TDC-19-2665

## MEMORANDUM OPINION

"American citizenship . . . is one of the most valuable rights in the world today." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963). Plaintiffs Roee Kiviti, Adiel Kiviti, and their minor child K.R.K. have filed this civil action seeking to uphold this right, requesting a declaratory judgment that K.R.K. is a United States citizen and that the policy on which Defendants Secretary of State Michael Pompeo and the United States Department of State (collectively, "the State Department") relied to deny K.R.K. a passport contravenes the United States Constitution, the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101–1537 (2018), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706 (2018). Plaintiffs also seek a permanent injunction barring the State Department from enforcing this policy. Pending before this Court are the State Department's Motion to Dismiss and Plaintiffs' Partial Motion for Summary Judgment. The Motions are fully briefed, and the Court held a hearing on both Motions on June 5, 2020. For

the reasons set forth below, the State Department's Motion will be GRANTED IN PART and DENIED IN PART, and Plaintiffs' Motion will be GRANTED.

## BACKGROUND

Roee Kiviti, a 41-year-old man, was born in Israel, moved to the United States in 1982 when he was four years old, and became a United States citizen in 2001. In 2009, he moved back to Israel, where, in 2011, he met Adiel Kiviti. Adiel Kiviti, also a 41-year-old man, was born and raised in Israel. The couple married in Santa Barbara, California on October 15, 2013. Roee Kiviti's work took him back to the United States in 2014, and Adiel Kiviti, after applying for and receiving lawful permanent residency, moved to the United States in May 2015. On January 8, 2019, Adiel Kiviti was naturalized as a U.S. citizen.

In 2016, Roee and Adiel Kiviti ("the Kivitis") had a son, L.R.K. L.R.K. was born in Canada through the use of assisted reproductive technology ("ART"), through which a Canadian volunteer gestational surrogate was implanted with an anonymously donated egg fertilized with Roee Kiviti's genetic material. On November 30, 2016, a Canadian court issued an order finding that the genetic and biological relationship between Roee Kiviti and L.R.K. had been established and ordering that the Kivitis, and not the surrogate, were L.R.K.'s only parents. L.R.K. was subsequently issued a birth certificate identifying Roee and Adiel Kiviti as his parents. After returning to the United States with L.R.K., the Kivitis applied for a United States passport for L.R.K. at a State Department office in Washington, D.C. L.R.K. was issued a U.S. passport on January 13, 2017. At no point were the Kivitis asked about their biological relationship to L.R.K.

In February 2019, the Kivitis had another child, K.R.K. Like L.R.K., K.R.K. was born through the use of ART, with a Canadian volunteer gestational surrogate implanted with a fertilized egg from an anonymous donor. Unlike for L.R.K., however, the donated egg was

fertilized with genetic material from Adiel Kiviti instead of Roee Kiviti.  On February 28, 2019, a Canadian court issued an order finding that Adiel Kiviti's biological and genetic relationship with K.R.K. had been established and ordering that the Kivitis, and not the surrogate, were K.R.K.'s only parents.  K.R.K. was subsequently issued a birth certificate identifying the Kivitis as K.R.K.'s parents.  The parties agree that the Kivitis are K.R.K.'s legal parents.

On May 1, 2019, after returning to the United States with K.R.K., the Kivitis applied for a U.S. passport for K.R.K. at the Los Angeles Passport Agency.  They were initially told that K.R.K. would be issued a passport in a few days.  The next day, however, Adiel Kiviti received a telephone call from a State Department employee asking for more information, including specific information relating to the surrogacy arrangement.  Adiel Kiviti then emailed the employee a copy of the Canadian court order that named the Kivitis as K.R.K.'s parents.  Nevertheless, because it was determined that Roee Kiviti did not have a biological relationship with K.R.K., the State Department evaluated K.R.K.'s passport application under 8 U.S.C. § 1409, the statutory provision that applies to children born out of wedlock and cross-references 8 U.S.C. § 1401(g), which applies when a child is born to one U.S. citizen parent and one non-U.S. citizen parent.  Because it determined that Adiel Kiviti had not satisfied the requirement of 8 U.S.C. § 1401(g) that he had resided in the United States for five years prior to K.R.K.'s birth, the State Department concluded that K.R.K. was not a U.S. citizen by birth and denied K.R.K.'s application for a U.S. passport.

On September 12, 2019, Plaintiffs filed suit in this Court.  On December 9, 2019, Plaintiffs filed an Amended Complaint in which they assert that a State Department policy requiring that both parents be biologically related to a child in order to consider that child born in wedlock, and the application of that policy to deny K.R.K.'s passport application, (1) was contrary to the text of the INA; (2) infringed on the substantive due process rights under the Fifth Amendment to the

3

Constitution of the Kivitis to marry, procreate, and raise their children, and of K.R.K. to obtain United States citizenship at birth; (3) discriminated against the Kivitis as a same-sex couple and against K.R.K. based on the circumstances of her birth and parentage, in violation of the equal protection component of the Fifth Amendment's Due Process Clause; and (4) constituted arbitrary and capricious agency action that is contrary to law, in violation of the APA.  As relief, Plaintiffs seek (1) a declaratory judgment pursuant to 8 U.S.C. § 1503 that K.R.K. acquired U.S. citizenship at birth; (2) an order requiring the State Department to issue her a passport; (3) a judgment declaring the State Department's policy unconstitutional and in violation of the INA; (4) a permanent injunction against the State Department treating the children of same-sex couples as born out of wedlock and thereby denying them U.S. citizenship at birth; and (5) attorney's fees and costs.

## DISCUSSION

In its Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the State Department argues that its biological relationship requirement is not only consistent with, but also required by, the statutory language of the INA and further asserts that, to the extent that the INA's text is ambiguous, its interpretation is owed deference.  As to the Fifth Amendment due process claim, the State Department argues that Plaintiffs have identified no fundamental liberty interest infringed upon by the denial of U.S. citizenship to K.R.K, and that this action is therefore subject to only rational basis review, which, the State Department argues, it easily passes.  The State Department also argues that the equal protection claim must be dismissed because Plaintiffs failed to allege intentional discrimination by the State Department and because the policy is facially neutral and applies to same-sex and opposite-sex couples alike.  Finally, it argues that the APA claim must be dismissed as Plaintiffs possess an adequate remedy at law.

Plaintiffs oppose the State Department's Motion and also move for partial summary judgment under Rule 56 on their INA and constitutional claims. Their Motion asserts that the State Department's interpretation of the INA is contrary to its statutory language and that, properly interpreted, the INA granted U.S. citizenship to K.R.K. at the moment of her birth. They also argue that the State Department's actions violated their substantive due process rights by infringing on multiple fundamental rights, in particular the right to marry and the "constellation of benefits . . . linked to marriage," which includes the right to make choices relating to procreation and childrearing and to confer citizenship at birth upon their children. *Obergefell v. Hodges*, 135 S. Ct. 2584, 2601 (2015). Finally, they argue that the State Department's policy violates their equal protection rights by treating same-sex couples and children of same-sex couples differently without a justification that would satisfy either heightened scrutiny or rational basis review. Plaintiffs have not moved for summary judgment on their APA claim but instead oppose the State Department's Motion to Dismiss this claim on the ground that they do not have an adequate remedy at law because the APA provides relief separate from that available through their other claims.

## I.     Legal Standards

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

Although a party may move for summary judgment before the commencement of discovery, *see* Fed R. Civ. P. 56(b), "summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Anderson*, 477 U.S. at 250 n.5). The proper procedure for seeking additional time for discovery is to file an affidavit pursuant to Rule 56(d) explaining why the party needs discovery to establish the existence of a genuine issue of material fact. *Id.* Where the State Department has neither filed a Rule 56(d) affidavit nor otherwise requested discovery, and the parties acknowledge that the underlying facts are not in dispute, the Court may, if justified, grant summary judgment in favor of Plaintiffs.

## II.     Citizenship at Birth

There are "two sources of citizenship, and two only:  birth and naturalization." *United States v. Wong Kim Ark*, 169 U.S. 649, 702 (1898); *Miller v. Albright*, 523 U.S. 420, 423 (1998) (plurality) (quoting *Wong Kim Ark*).  Only the first source of citizenship, birth, is at issue here. Within this first category, the Constitution explicitly guarantees birthright citizenship to any child born within the United States:  "All persons born . . . in the United States, and subject to the jurisdiction thereof, are citizens of the United States."  U.S. Const. amend. XIV, § 1; *Wong Kim Ark*, 169 U.S. at 704.  Those not born in the United States may still acquire citizenship "by birth" "as provided by Acts of Congress."  *Miller*, 523 U.S. at 424.  A dispute over the interpretation of such an Act gives rise to this case.

### A.     The Statutory Framework

Congress has generally provided that under certain circumstances, a child "born . . . of" at least one U.S. citizen parent receives U.S. citizenship at birth even if that child is born outside the United States.  8 U.S.C. § 1401.  For such children, Congress has set forth different requirements for the acquisition of citizenship at birth depending on whether the child in question was born in or out of wedlock.  First, 8 U.S.C. § 1401, which applies where a child is born to a married couple, "establish[es] a range of residency and physical-presence requirements calibrated primarily to the parents' nationality and the child's place of birth."  *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 (2017).  As relevant here, it provides that U.S. citizenship is granted at birth to:

> (c) a person born outside of the United States and its outlying possessions of parents both of whom are citizens of the United States and one of whom has had a residence in the United States or one of its outlying possessions, prior to the birth of such person.

* * *

> (g) a person born outside the geographical limits of the United States and its
> outlying possessions of parents one of whom is an alien, and the other a citizen
> of the United States who, prior to the birth of such person, was physically
> present in the United States or its outlying possessions for a period or periods
> totaling not less than five years, at least two of which were after attaining the
> age of fourteen years.

8 U.S.C. § 1401(c), (g).

A second statute, 8 U.S.C. § 1409, applies to "[c]hildren born out of wedlock" and imposes additional requirements for the conferral of citizenship at birth. 8 U.S.C. § 1409; *see also Sessions*, 137 S. Ct. at 1687 ("Section 1409 pertains specifically to children with unmarried parents."). It provides:

> The provisions of paragraphs (c), (d), (e), and (g) of section 1401 of this title, and
> of paragraph (2) of section 1408 of this title, shall apply as of the date of birth to a
> person born out of wedlock if—
>
> (1) a blood relationship between the person and the father is established
> by clear and convincing evidence,
> (2) the father had the nationality of the United States at the time of the
> person's birth,
> (3) the father (unless deceased) has agreed in writing to provide financial
> support for the person until the person reaches the age of 18 years, and
> (4) while the person is under the age of 18 years—
>
> (A) the person is legitimated under the law of the person's
> residence or domicile,
> (B) the father acknowledges paternity of the person in writing
> under oath, or
> (C) the paternity of the person is established by adjudication of a
> competent court.

8 U.S.C. § 1409(a). Although the statute uses gender-specific language and in fact includes another subsection providing that a child born out of wedlock to a U.S. citizen mother receives U.S. citizenship at birth if the mother had been continuously present in the United States for a period of one year, the United States Supreme Court struck down that relaxed residency requirement as violative of equal protection of the law. *See* 8 U.S.C. § 1409(c); *Sessions*, 137 S.

Ct. at 1700-01. Thus, the residency requirements of § 1401(g) apply to a child born out of wedlock who has either a U.S. citizen father or a U.S. citizen mother. *Sessions*, 137 S. Ct. at 1701.

### B. The Foreign Affairs Manual

The Secretary of State is charged with administering the INA as it relates to "the determination of nationality of a person not in the United States." 8 U.S.C. § 1104(a). The Secretary is also empowered to "grant and issue passports," 22 U.S.C. § 211a (2018), which "may be issued only to . . . U.S. national[s]," 22 C.F.R. § 51.2 (2019), and have "the same force and effect as proof of United States citizenship as certificates of naturalization or of citizenship issued by the Attorney General or by a court having naturalization jurisdiction," 22 U.S.C. § 2705.

The State Department has provided written guidance for its officials adjudicating passport applications, set forth in the Foreign Affairs Manual ("FAM"), which, along with other "Handbooks," forms "a single, comprehensive, and authoritative source for the Department's organization structures, policies, and procedures that govern the operations of the State Department, the Foreign Service and, when applicable, other federal agencies." Joint Statement of Undisputed Facts ¶ 38, ECF No. 58. Although the FAM reflects State Department policy, it has been neither approved by Congress nor subjected to notice-and-comment rulemaking.

The FAM includes the State Department's interpretation of the INA as it relates to determining whether children born abroad are U.S. citizens at birth. *See* 8 Foreign Affairs Manual ("FAM") §§ 301.4, 304.1, 304.3, Joint Record ("J.R.") 105-21, ECF Nos. 57-7, 57-8, 57-9. Under this interpretation, any citizen-parent through whom U.S. citizenship is sought to be conveyed must be biologically related to the child. In general, the FAM states that "[a]bsent a blood relationship between the child and the parent on whose citizenship the child's own claim is based, U.S. citizenship is not acquired." 8 FAM § 301.4(D)(1)(a). The FAM also applies a blood

relationship requirement to the question of whether a child is born in wedlock or out of wedlock. The FAM states that "[t]o say a child was born 'in wedlock' means that the child's biological parents were married to each other at the time of the birth of the child." 8 FAM § 304.1-2(c). Consequently, "[i]f a married woman and someone other than her spouse have a biological child together, that child is considered to have been born out of wedlock," and "a child born to a married man and a person other than his spouse" will be considered to have been born "out of wedlock." 8 FAM § 304.1-2(e). As a result, based on the FAM, the State Department will apply the reduced residency requirement of 8 U.S.C. § 1401(c), which applies to children born in wedlock, only if a child of married U.S. citizen parents has a biological relationship with both parents.

The FAM further states that a male parent has "a biological relationship" with a child, or a "blood relationship" with a child as the term is used in 8 U.S.C. § 1409(a) in relation to children born out of wedlock, when he has a "genetic parental relationship to the child." 8 FAM § 301.4(D)(1)(c). While the FAM previously included an identical requirement for female parents, in 2014 the State Department altered the FAM to provide that "[a] woman may establish a biological relationship with her child either by virtue of being the genetic mother (the woman whose egg was used in conception) or the gestational mother (the woman who carried and delivered the baby)." *Id.* There was no amendment to the INA that triggered this change in interpretation.

The FAM contains other provisions clarifying the application of this biological relationship requirement when ART was used in the birth of a child. The FAM provides that a surrogate who gives birth to the child but "who is not the legal parent of the child at the time of the child's birth in the location of the birth" is not relevant to the citizenship analysis. *See* 8 FAM § 304.3-2(a) ("[T]he surrogate's citizenship is irrelevant to the child's citizenship analysis."). Likewise, an

10

anonymous sperm or egg donor is also a nullity in the citizenship analysis.  8 FAM § 304.3-3 ("U.S. citizenship cannot be transmitted by an anonymous sperm or egg donor.").

Further, the FAM identifies certain scenarios involving ART in which the child is deemed to be born in wedlock to two U.S. citizen parents.  It provides that a child born abroad to a surrogate gestational mother who is not the child's legal parent at birth, but whose legal and biological parents are a U.S. citizen mother and a U.S. citizen father, is considered to have been born in wedlock to two U.S. citizen parents.  8 FAM § 304.3-2(b).  It also states that where a child is born abroad to a married U.S. citizen gestational mother who is the legal parent of the child at the time of the birth and a U.S. citizen biological father, the child is considered to have been born in wedlock to two U.S. citizen parents, even where an anonymous egg donor was used.  8 FAM § 304.3-1(a).  Similarly, a child born abroad is deemed to be born in wedlock to two U.S. citizen parents where the gestational mother "is the legal parent of the child at the time of birth in the location of birth" and the "genetic parents are an anonymous sperm donor and the U.S. citizen wife of the gestational legal mother."  8 FAM § 304.3-1(b).

However, where a child is born to two married fathers by way of a surrogate who was implanted with an egg from an anonymous donor that was fertilized by one of the father's genetic material, the State Department does not consider that child to have been born in wedlock. According to the deposition testimony of Paul Peek, an official of the State Department's Bureau of Consular Affairs, two married men can never have a child that the State Department considers to have been born in wedlock.  Instead, the children of such marriages are always deemed to have been born out of wedlock and must have their claims to citizenship at birth adjudicated through § 1409(a).

### III.    INA

Plaintiffs first argue that the State Department, both in policy and practice, has misinterpreted the relevant provisions of the INA, which they contend establish that K.R.K. was a U.S. citizen at birth.  The INA provides that "[i]f any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States," that person may bring an action "for a judgment declaring him to be a national of the United States."  8 U.S.C. § 1503(a).  Pursuant to § 1503(a), Plaintiffs seek such a declaration of citizenship for K.R.K.

This provision does not specify the circumstances under which a court should declare a person to be a national of the United States, so federal courts "look to the nationality provisions of the INA for guidance."  *Patel v. Napolitano*, 706 F.3d 370, 372 (4th Cir. 2013).  Where the INA provides that a "national of the United States" includes "a citizen of the United States," 8 U.S.C. § 1101(a)(22), the analysis centers on 8 U.S.C. §§ 1401 and 1409.

Section 1401(c), provides, in its entirety:

The following shall be nationals and citizens of the United States at birth:

* * *

> (c)    a person born outside of the United States and its outlying possessions of parents both of whom are citizens of the United States and one of whom has had a residence in the United States or one of its outlying possessions, prior to the birth of such person.

8 U.S.C. § 1401(c).  Plaintiffs argue that K.R.K. should have been treated as a "person born outside of the United States . . . of parents both of whom are citizens of the United States" under 8 U.S.C. § 1401(c) because at the time of her birth, both Roee and Adiel Kiviti were legally identified as her parents, they were married, they were both U.S. citizens, and Adiel Kiviti was her biological

father.  Because both Kivitis "had a residence in the United States . . . prior to the birth," the requirement that one of the parents had such a residence was satisfied, and K.R.K. would qualify as a U.S. citizen by birth.  *Id.*  They argue that the State Department erred when it did not apply this analysis and instead considered K.R.K. to have been born "out of wedlock" under 8 U.S.C. § 1409(a) because although her legal parents were married at the time of her birth, they are not both her biological parents.  Where § 1409(a) incorporates § 1401(g), the State Department thus deemed K.R.K. to be "a person born outside the geographical limits of the United States . . . of parents one of whom is an alien, and the other a citizen of the United States" under 8 U.S.C. § 1401(g).  Where her biological father, Adiel Kiviti, did not meet the requirement of having been "physically present in the United States . . . for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years," she was found not to be a U.S. citizen at birth.  8 U.S.C. § 1401(g).

On its face, § 1401(c) does not include an explicit requirement that both parents be biologically related to the child.  The crux of the parties' disagreement thus boils down to the legal question of whether the language "born . . . of parents" in 8 U.S.C. § 1401(c) signifies that this provision applies only where both married parents are biologically related to a child.  Although neither the Supreme Court nor the United States Court of Appeals for the Fourth Circuit has addressed this question, two United States Courts of Appeals have interpreted the same "born . . . of parents" formulation found in § 1401 as not requiring a biological relationship between the child and the relevant parent.  In *Scales v. INS*, 232 F.3d 1159 (9th Cir. 2000), the United States Court of Appeals for the Ninth Circuit considered whether a plaintiff born in the Philippines was a U.S. citizen at birth where he was born to a mother who was a citizen of the Philippines and married to a U.S. citizen at the time of the birth, and the couple jointly raised the child as their son, even

though the U.S. citizen father had acknowledged that he was not the biological father of the child. *Id.* at 1161-62.   Interpreting the former § 1401(a)(7), which has since been reclassified as § 1401(g), the court held that the plaintiff was "born . . . of parents one of whom is an alien, and the other a citizen of the United States," even absent a biological relationship with the U.S. citizen father. *Id.* at 1162-63, 1166.   The court held that "[a] straightforward reading of § 1401 indicates . . . that there is no requirement of a blood relationship" and rejected the argument that the lack of a biological relationship between the plaintiff and one of his parents meant that he should be considered to have been born out of wedlock and have had his claim adjudicated under § 1409 "because [the plaintiff] was born to parents who were married at the time of his birth." *Id.* at 1164.

In a later case, the Ninth Circuit applied the holding of *Scales* to find that a plaintiff born in Mexico was a U.S. citizen at birth under 8 U.S.C. § 1401(g) because his biological father, who was a Mexican national, was married at the time of his birth to a female U.S. citizen who, while not biologically related to the child, accepted the child as her own, raised him from birth, and was listed on the child's birth certificate along with the biological father. *Solis-Espinoza v. Gonzales*, 401 F.3d 1090, 1093-94 (9th Cir. 2005).   Notably, the court held that where his parents were married at the time of his birth, the plaintiff was not born "out of wedlock," and thus subject to § 1409(a), even though his U.S. citizen mother was not his biological mother. *Id.* at 1093.   These principles were not disturbed in *United States v. Marguet-Pillado*, 560 F.3d 1078 (9th Cir. 2009), cited by the State Department, a case in which the court explicitly recognized that *Scales* had held that "a blood relationship is not absolutely required" because of "the tradition that a man is considered to be the natural father of a child born during wedlock" but distinguished the plaintiff's claim on the grounds that he sought citizenship through a father who was not married to his mother at the time of his birth. *Id.* at 1083.

The United States Court of Appeals for the Second Circuit has reached the same conclusion on this issue. In *Jaen v. Sessions*, 899 F.3d 182 (2d Cir. 2018), the plaintiff had been born in Panama to a Panamanian mother who was at the time married to a U.S. citizen, Jorge Boreland. *Id.* at 184. Although it was undisputed that the plaintiff's biological father was a different man, Liberato Jaen, and the plaintiff's Panamanian birth certificate listed Jaen as the father, where the mother was married to Boreland at the time of the birth, the court held that, under the same "born . . . of parents" language in § 1401(g), the petitioner was born of Boreland and was thus a U.S. citizen. *Id.* at 184-85, 188. In so ruling, the court specifically held that where Congress used the term "parent" without providing a definition, it had "incorporated the common law meaning of 'parent' into the INA [and] therefore incorporated the longstanding presumption of parentage based on marriage." *Id.* at 188. The State Department's claim that the Second Circuit reached a different conclusion in *Colaianni v. INS*, 490 F.3d 1085 (2d Cir. 2007), is unpersuasive because in that case, which predated *Jaen*, the court rejected the plaintiff's claim that he was entitled to citizenship based on his adoption by U.S. citizen parents under the predecessor provision to § 1401(c) not by concluding that the term "born . . . of parents" required a biological relationship, but by stating that "it pertains only to the acquisition of citizenship 'at birth.'" *Id.* at 187.

In both *Scales* and *Jaen*, the court relied significantly on the fact that Congress included the term "blood relationship" in § 1409(a) as part of a requirement of a biological relationship, yet did not use that term in § 1401. *See Scales*, 232 F.3d at 1164 (finding that if Congress had wanted to require a "blood relationship" for a child born to married parents "it knew how to do so"); *Jaen*, 899 F.3d at 189. As the court found in *Jaen*, "Congress clearly specified enhanced requirements for proof of parentage in the case of children born out of wedlock. 'Congress' omission of the similar language' regarding married parents suggests that if Congress wanted to require proof of

biological relationship 'it knew how to do so.'"  *Jaen*, 899 F.3d at 189 (quoting *Custis v. United States*, 511 U.S. 485, 492 (1994)).  Accordingly, "the textual distinction between the sections regarding children of married parents and children of unmarried parents is strongly suggestive of a clear Congressional intent to treat the two categories differently on this point."  *Id.*  This year, another federal court, the United States District Court for the District of Columbia, agreed with the Second and Ninth Circuits and concluded that "the plain language of 8 U.S.C. § 1401 does not require proof of a biological relationship between the child born abroad to married U.S. citizen parents."  *Sabra v. Pompeo*, No. 19-CV 2090(EGS), 2020 WL 1643676, at *20 (D.D.C. Apr. 2, 2020) (citing *Jaen* and *Scales*).

One federal court has addressed this issue in the context of a same-sex couple and reached the same conclusion as to the statutory language.  In *Dvash-Banks v. Pompeo*, No. 18-523-JFW(JCX), 2019 WL 911799 (C.D. Cal. Feb. 21, 2019), the court considered an application by a same-sex, married couple, one of whom was a U.S. citizen and one of whom was not, for U.S. citizenship for their twins born from a gestational surrogate in Canada though donor eggs, one of whom had the genetic material of the U.S. citizen father and the other of whom had the genetic material of the non-citizen father.  *Id.* at *1-2.  Applying *Scales*, the court held that both twins were U.S. citizens under § 1401(g) where their parents were married at their birth and one parent was a U.S. citizen, because "the word 'parents' as used in Section [1401(g)] is not limited to biological parents and . . . the presumption of legitimacy that applies when a child is born to married parents—as codified in the INA—cannot be rebutted by evidence that the child does not have a biological tie to a U.S. citizen parent."  *Id.* at *7.

### A.      Statutory Interpretation

Upon review of the text of § 1401 and the surrounding provisions of the INA, the Court agrees with the Second and Ninth Circuits that the term "born . . . of parents" does not limit the provision's application to those children who have biological relationships with both of their married parents.   The Court first considers the specific text of the statute.

### 1.      "Parents"

The use of the term "parents" does not necessarily establish that a biological relationship is required with each parent.   Nowhere in the INA is the term "parent" defined to include only those with a biological relationship to a child.   The INA defines the term "parent" as used in subchapter III, the part of the INA including § 1401 and § 1409, only to the extent of stating that the term "include[s] in the case of a posthumous child a deceased parent, father, and mother."   8 U.S.C. § 1101(c)(2).   Elsewhere, in relation to subchapters I and II of the INA, the statute explicitly defines "parent" to include "a parent, father, or mother" whose relationship to a child "exists by reason" of one of numerous circumstances, including several non-biological relationships such as those of stepparents and adoptive parents.   Notably, the INA at times uses the term "natural parent," sometimes in contrast to "adoptive parent," but does not use that language in § 1401(c). *See, e.g.*, 8 U.S.C. § 1101(c)(1)(E)-(G).

In the absence of a specifically applicable definition of a key term, the Court looks to whether the term has an established common law meaning.   *See NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981) ("Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.").   At common law, the term "parent" does not refer only to those with a biological relationship with a child.   The common law

presumption of legitimacy, which assumes that where a child is born to a married couple, both married individuals are parents of the child, is a "fundamental principle of the common law." *Michael H. v. Gerald D.*, 491 U.S. 110, 113, 124 (1989) (plurality); *see also McMillian ex rel. McMillian v. Heckler*, 759 F.2d 1147, 1153 (4th Cir. 1985) ("The presumption is one of the most venerable, persistent, and continuously pervasive in the common law."). In *Michael H.*, the Supreme Court effectively recognized that status as a parent can derive from marriage rather than biology when it upheld against a due process claim a California law that allowed challenges to the presumption of the legitimacy of a child born into a marriage to be brought only by the husband or wife in the marriage, even though the result was that the rights of "the husband of the marriage" were given a categorical preference, and the biological father outside the marriage was unable to establish parental rights. *Id.* at 129. In so ruling, the Court noted that it was "not aware of a single case, old or new," where a court "award[ed] substantive parental rights to the natural father of a child conceived within, and born into, an extant marital union that wishes to embrace the child." *Id.* at 127. Elsewhere, the Supreme Court has recognized that "[t]he institution of marriage has played a critical role . . . in defining the legal entitlements of family members" and that "the mere existence of a biological link does not merit" constitutional protections relating to parental rights. *Lehr v. Robertson*, 463 U.S. 248, 256-57, 261 (1983) (holding that a statutory scheme for distributing notice of adoption proceedings to putative biological fathers did not violate the due process rights of such an individual who was not notified of a child's adoption proceeding before its conclusion, where the father had not previously sustained a relationship with his child).

Based on these longstanding principles, multiple state laws "generally require[] the name of the mother's male spouse to appear on the child's birth certificate—regardless of his biological relationship to the child." *See Pavan v. Smith*, 137 S. Ct. 2075, 2077 (2017) (per curiam)

(describing Arkansas law); *see also* Ala. Code § 22-9A-7(f)(1) (2019) ("If the mother was married at the time of either conception or birth, or between conception and birth, the name of the husband shall be entered on the certificate as the father of the child, unless it is established by law that he is not the father of the child."); Alaska Stat. § 18.50.160(d) (2019) (providing that if "the mother married at conception, during the pregnancy, or at birth, the name of the husband shall be entered on the certificate as the father of the child" unless certain specific conditions exist). In turn, certain courts have extended the presumption that a person is the legal parent of a child based on marriage to a biological parent at the time of birth to same-sex marriages, even though it is undisputed that one of the married individuals is not the biological parent of the child. *See, e.g.*, *McLaughlin v. Jones ex rel. Cty. of Pima*, 401 P.3d 492, 494 (Ariz. 2017) (holding that Arizona's statutory presumption of parentage applies in the case of children born to same-sex married couples); *Boquet v. Boquet*, 269 So. 3d 895, 900 (La. Ct. App. 2019), *writ denied*, 274 So. 3d 1261 (La. 2019) (same). Thus, the term "parents," on its own, does not impose a requirement that both putative parents have a biological relationship with the child.

### 2. "Born . . . of"

In the face of this common law principle, the State Department argues that what matters in the phrase "born . . . of parents" is not the word "parents," but rather the words "born of." Reply Mot. Dismiss at 7, ECF No. 52. It argues that the dictionary definitions of "born" and "of," when combined, mean that the child "originates or derives from those parents," which it further argues can be the case only if there is a biological relationship to both of those parents. Mot. Dismiss at 20, ECF No. 46-1. This argument is unpersuasive for two reasons. First, the phrase "born . . . of parents" must still be viewed against the backdrop of the common law presumption of parentage, which effectively considered a child to be born of parents consisting of a biological parent and that

parent's spouse at the time of the birth, without requiring proof that the spouse had a genetic relationship with the child. Indeed, in *McMillian*, the court noted that a state court order had identified the child at issue as "born of" the marriage of the mother and her husband who was not the biological father. *See McMillian*, 759 F.2d at 1149, 53 (stating, in relation to the common law presumption, that "[i]t would be anomalous if federal statutory law concerned with or dependent in any way upon determinations of the parentage of children born in wedlock did not include as an interstitial common law element a presumption so universally applied by the states"). *Cf. Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986) (noting that the "normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific"); *Bradley v. United States*, 410 U.S. 605, 609 (1973) ("[T]he law uses familiar legal expressions in their familiar legal sense." (quoting *Henry v. United States*, 251 U.S. 393, 395 (1920))).

Second, even under the State Department's approach, the term "born . . . of" is susceptible to a range of interpretations. A child could fairly be deemed to originate from parents other than through a genetic relationship, such as where two married parents both play a fundamental and instrumental role in the creation of the child, for example by, as here, together planning and supporting the use of surrogacy and ART to bring about the birth of a child to whom they have both committed in advance to be a parent. Indeed, the elasticity of the term "born . . . of" is evident from the State Department's recent change in policy, untethered to any change in the statute, to include within this term gestational mothers with no genetic relationship to the children they bear. Thus, the Court finds no biological requirement inherent in the phrase "born . . . of parents." 8 U.S.C. § 1401(c).

### 3.    "Blood Relationship"

In addition to considering the plain text of § 1401(c), the Court must also examine the relevant context of the remainder of the statutory scheme in question, including § 1409.  Critically, while § 1401(c) includes no explicit biological requirement alongside its use of the term "born . . . of parents," § 1409 uses the term "a blood relationship" to describe a requirement to permit a father to a child born out of wedlock to confer U.S. citizenship upon the child.  8 U.S.C. § 1409(a)(1).  The contrast between these two statutes is telling for multiple reasons.  First, the inclusion of an explicit biological relationship requirement in § 1409 makes clear that Congress knew how to include a biological relationship requirement where it wanted one.  It thus follows that if such a relationship was intended to be a requirement in § 1401(c), Congress would have used the term "blood relationship" there, too.  *Jaen*, 899 F.3d at 189 ("'Congress' omission of similar language' regarding married parents suggests that if Congress wanted to require proof of biological relationship, 'it knew how to do so.'" (quoting *Custis v. United States*, 511 U.S. 485, 492 (1994)));  *Scales*, 232 F.3d at 1164.  Similarly, the fact that Congress used the term "natural parent" elsewhere in the INA, *see, e.g.*, 8 U.S.C. § 1101(c)(1)(E)-(G), but failed to use it in § 1401(c), further reveals that no biological relationship is required.  "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion."  *Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

Second, interpreting the "born . . . of parents" language used in § 1401(c) to include a biological relationship requirement would mean that § 1409, which by reference directs the application of § 1401(c) under certain circumstances, contains two biological relationship

requirements, an interpretation that runs afoul of the "well-established rule" that courts "cannot adopt a reading of [a statute] that renders part of the statute superfluous over one that gives effect to its 'every clause and word.'" *United States v. Simms*, 914 F.3d 229, 241 (4th Cir. 2019) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)), *cert. denied*, 140 S. Ct. 304 (2019).

The State Department raises several arguments against the significance of the use of "blood relationship" in § 1409(a). First, it argues that the distinction between the presence of an explicit biological relationship requirement in § 1409(a) and the absence of an explicit biological-relationship requirement in § 1401(c) is not relevant because the term "blood relationship" was added to § 1409(a) only in an amendment in 1986. This amendment, however, strengthens, rather than weakens, the Court's interpretation. As the State Department itself notes, "negative implications raised by disparate provisions are strongest when the provisions were considered simultaneously when the language raising the implication was inserted." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (quoting *Lindh v. Murphy*, 521 U.S. 320, 330 (1997)). The State Department acknowledges that Congress, in the same bill through which it added the "blood relationship" requirement to § 1409, made certain changes to § 1401 as well. *See* INA Amendments of 1986, Pub. L. No. 99-653, §§ 12-13, 100 Stat. 3655, 3657. The fact that Congress considered changes to § 1401 and § 1409 at the same time but inserted the "blood relationship" requirement only in § 1409 strengthens the view that there is no biological requirement in § 1401.

Second, the State Department argues that its reading does not create superfluous provisions on biological relationships because "§ 1409(a) requires unmarried fathers not only to prove a biological relationship with their children, but to do so by clear and convincing evidence. Section 1401's biological-relationship requirement, by contrast, can be satisfied by a preponderance of the evidence." Reply Mot. Dismiss at 6. In identifying a preponderance of the evidence standard

applicable to the alleged biological requirement in § 1401(c), however, the State Department does not point to any statutory language in that section or any other part of the INA, or even to a judicial interpretation of § 1401(c).  It cites only the FAM.  Where it is the FAM's interpretations themselves that are at issue here, this is too thin a reed on which to support the State Department's argument, especially where, as Plaintiffs have argued, if Congress had used the term "blood relationship" merely to impose a standard of proof on a pre-existing biological relationship requirement, it would have stated that "*the* blood relationship between the person and the father is established by clear and convincing evidence" instead of stating that "*a* blood relationship between the person and the father is established by clear and convincing evidence."  8 U.S.C. § 1409(a)(1) (emphasis added).  The Court therefore finds the failure to use the term "blood relationship" or "natural parent" in § 1401 to be convincing evidence that the term "born . . . of parents" does not require a biological relationship with both married parents.

### 4.    Section 1401(g)

Finally, the Court finds that the State Department's interpretation is severely undermined because it leads to a result that is contrary to the language of the statute.  Under the State Department's analysis, K.R.K. was born out of wedlock because one of her married parents is not her biological parent, such that she is subject to § 1409(a), and by extension § 1401(g), since she has, under its view, one, but not two, U.S. citizen biological parents.  Section 1401(g), however, allows for citizenship where one parent is a U.S. citizen and the other is an "alien."  8 U.S.C. § 1401(g).  Under the State Department's interpretation of the INA, neither an anonymous egg donor nor a gestational surrogate who is not a legal parent qualifies as a parent for purposes of the citizenship analysis.  8 FAM § 304.3-2(a).  Thus, although the State Department acknowledges that K.R.K. should receive consideration for U.S. citizenship at birth under § 1401 based on her

biological relationship with Adiel Kiviti, K.R.K. does not actually have an "alien" parent and therefore cannot be subject to § 1401(g) based on the plain language of the statute.  The fact that the State Department's interpretation cannot be reconciled with the statutory language provides another reason to accept Plaintiffs' interpretation, which places K.R.K. under § 1401(c), as the only reasonable reading that is consistent with the statutory language.  *Cf. Stone v. Instrumentation Lab. Co.*, 591 F.3d 239, 243 (4th Cir. 2009) (noting that courts will not accept an interpretation that would "thwart the statute's obvious purpose" or "lead to an absurd result").

Upon consideration of the common law understanding of parentage alongside the text of both § 1401(c) specifically and the statutory scheme as a whole, the Court finds that the statute is clear and unambiguous that the phrase "born . . . of parents" in 8 U.S.C. § 1401(c) does not require a biological relationship with both parents.  *See Jaen*, 899 F.3d at 187-90; *Scales*, 232 F.3d at 1164-66.

### B.    Extra-Statutory Arguments

Where its interpretation of the language of the statute is unconvincing, the State Department offers various extra-statutory arguments.  First, the State Department argues that because its interpretation that § 1401(c) requires a biological relationship with both parents is longstanding, Congress necessarily adopted it when it amended the INA without changing the text to abrogate that interpretation.  In advancing this argument, the State Department relies on the principle that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."  *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978).  Consideration of this principle, however, is secondary to consideration of the text of the statute itself and inapplicable where, as here, the court has already found the statutory language itself to be sufficient to establish its clear meaning.  *See Demarest v.*

*Manspeaker*, 498 U.S. 184, 190 (1991) ("Where the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction."); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) (stating that such "postenactment developments" are not even afforded "the weight of contemporary legislative history").  Moreover, the State Department has cited no authority for the application of this principle, typically applied to agency interpretations contained in promulgated regulations subject to notice and comment, to an internal policy manual such as the FAM.  *See N. Haven Bd. of Educ.*, 456 U.S. at 535 (considering this factor where agency regulations were promulgated, published, and submitted to Congress for review and the opportunity to disapprove of them); *CFTC v. Schor*, 478 U.S. 833, 845-46 (applying this principle to promulgated regulations); *W. Va. CWP Fund v. Bender*, 782 F.3d 129, 140 (4th Cir. 2015) (same).  Finally, the Supreme Court has clarified that this principle applies "[w]here an agency's statutory construction has been fully brought to the attention of the public and the Congress," and Congress has nevertheless "not sought to alter that interpretation although it has amended the statute in other respects."  *N. Haven Bd. of Educ.*, 456 U.S. at 535; *see also Demarest*, 498 U.S. at 190 ("There is no indication that Congress was aware of the administrative construction . . . at the time it revised the statute.").  The State Department has cited no evidence that Congress was made aware of the FAM's interpretation of the relevant text prior to the 1986 amendments to the INA and, indeed, has cited no evidence that the specific statutory interpretation at issue here even predates 1986, other than an unsupported and uncited statement in the current version of the FAM that the general requirement of a biological relationship dates back to 1790.  8 FAM § 301.4-1(B).  Where there is no evidence that a biological relationship could have been proven in 1790, that claim is highly dubious.

Second, the State Department argued for the first time during the hearing on the Motions that the enactment of the Child Citizenship Act of 2000 ("CCA"), Pub. L. 106-395, 114 Stat. 1631 (2000), which granted automatic citizenship by naturalization to adopted and other children born outside the United States who do not qualify for citizenship at birth, 8 U.S.C. § 1431, reveals congressional intent as to § 1401(c) because the legislative history of the CCA reflected an understanding of a biological relationship requirement.  The cited House Report, however, reflects that the original purpose of the CCA was to provide automatic citizenship to children adopted by U.S. citizens, but that such children were not provided citizenship at birth under § 1401 to avoid treating them more favorably than "other children of U.S. citizens born abroad," whom it described as U.S. citizens who did not qualify for such citizenship based on the residency requirements in § 1401.  H.R. Rep. No. 106-852, at 5 (2000).  The statute therefore placed such children and adopted children of U.S. citizens on par as subject to automatic naturalization, but not citizenship at birth. *See id.*  Where the House Report did not characterize children eligible for citizenship under § 1401 as limited to those with a biological relationship to U.S. citizens, it does not advance the State Department's position.

Third, the State Department argues that "a tiebreaking factor" is the deference owed to the State Department's interpretation under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  Mot. Dismiss at 22.  Specifically, it argues that the fact that the State Department has long interpreted § 1401(c) to require a biological relationship with both parents should, all else equal, cause the Court to do so as well.  As noted above, the Court finds the statutory text to establish unambiguously that § 1401(c) does not require a biological relationship between the child and both parents to be applicable.  Where the State Department's interpretation is not persuasive, *Skidmore* deference is not warranted.  *Nahigian v. Juno-Loudoun, LLC*, 677 F.3d 579, 587 (4th Cir. 2012) (declining to

grant *Skidmore* deference to an agency interpretation where the interpretation was foreclosed by the "plain language of the statute"); *Sabra*, 2020 WL 1643676, at *20 (declining to apply *Skidmore* deference to the FAM's interpretation of § 1401 because the plain language of the statute does not support a biological relationship requirement).

Finally, the State Department argues that its interpretation adheres to the principle of *jus sanguinis*, the concept that citizenship should be conferred based on "blood" irrespective of place of birth, and the Supreme Court's prior references to "the importance of the government's interest in 'assuring that a biological . . . relationship exists' between a child and a parent through whom the child claims citizenship." Mot. Dismiss at 21 (quoting *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 60 (2001)); *Tuaua v. United States*, 788 F.3d 300, 308 (D.C. Cir. 2015) (defining *jus sanguinis* as the "right of the blood . . . where birthright citizenship is based upon nationality of a child's parents"). This emphasis is misplaced. Notably, the only two cases the State Department cites on this point involved challenges to the statutory provision for children born of unmarried parents, in which there is an explicit "blood relationship" requirement, 8 U.S.C. § 1409(a), and for which the longstanding governmental interest of supporting the traditional presumption of parentage based on marriage to a biological parent was not at issue. *See Tuan Anh Nguyen v. INS*, 533 U.S. 53, 57-58 (2001); *Miller*, 523 U.S. at 424-26.

More broadly, although the State Department invokes the concept of *jus sanguinis*, it identifies no place in the Constitution, the INA, or another federal statute where that principle has been explicitly adopted by the United States. Certain nations have adopted the principle of *jus sanguinis* as the recognized basis for birthright citizenship. *Faddoul v. INS*, 37 F.3d 185, 189 n.3 (5th Cir. 1994) ("*Jus sanguinis* . . . continues to be the primary basis for citizenship throughout much of Europe, Africa, and the Near East."). The United States, as reflected in the Fourteenth

Amendment's guarantee of citizenship to all children born in the United States regardless of parentage, primarily subscribes to the principle of *jus soli*, "that the place of birth governs citizenship status except as modified by statute." *Rogers v. Bellei*, 401 U.S. 815, 828 (1971); *Wong Kim Ark*, 169 U.S. at 674 (noting "the established rule of citizenship by birth within the dominion"). Thus, there is nothing inconsistent with the constitutional and legal traditions of the United States for Congress to have supplemented *jus soli* birthright citizenship with citizenship at birth for certain children who are born abroad based on parentage at birth, which traditionally has not been limited to biological parents but has included others, such as those who became parents at birth through marriage. Inclusion of all children born of two married U.S. citizen parents is fully consistent with the intent of the INA to "provide for a liberal treatment of children" and to address "the problem of keeping families of United States citizens and immigrants united." H.R. Rep. No. 85-1199, at 2020 (1957); *see also Solis-Espinoza*, 401 F.3d at 1094 (stating that the INA "was intended to keep families together" and "should be construed in favor of family units and the acceptance of responsibility by family members"). Particularly where, as here, K.R.K. undisputedly has a biological relationship with a U.S. citizen father who was married to another U.S. citizen at the time of her birth, a finding that she was a U.S. citizen at birth under § 1401(c) as a child "born . . . of" two U.S. citizen parents fully aligns with American traditions relating to citizenship.

### C. Constitutional Avoidance

For their part, Plaintiffs argue that the principle of constitutional avoidance favors adoption of its interpretation of § 1401(c) so as to avoid constitutional problems created by the State Department's alternative reading. "Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises

serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). It may be applied if one proposed statutory interpretation "would raise a multitude of constitutional problems," even without a finding of an actual constitutional violation. *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005). "Indeed, one of the canon's chief justifications is that it allows courts to *avoid* the decision of constitutional questions." *Id.*

As discussed above, the Court finds that, as a matter of the plain text of the statute, § 1401(c) does not require a biological relationship between the child and both parents to be applicable. Application of the canon of constitutional avoidance is therefore not necessary for the Court to reach this conclusion. In the alternative, the Court concludes that if the statutory language were deemed ambiguous, the canon would apply and would lead to the same result because the State Department's interpretation "would raise a multitude of constitutional problems." *Id.*

Drawing on the Supreme Court's decisions in *United States v. Windsor*, 570 U.S. 744 (2013), *Obergefell*, 135 S. Ct. 2584, and *Pavan*, 137 S. Ct. 2075, Plaintiffs' constitutional arguments are best understood as asserting three highly related claims. First, they argue that the State Department's policy violates the Kivitis' substantive due process rights by infringing on their fundamental liberty interests in marriage and in forming a family. Second, they argue that the policy violates the Kivitis' equal protection rights by treating their "marriage, as well as the marriages of other same sex couples, as second-class" because under the State Department's policy, a married male, same-sex couple will never be able to have their child considered to have been born in wedlock. Mot. Summ. J. at 31, ECF No. 47-1. Third, they argue that K.R.K's equal protection rights are violated because the policy "penalizes children for the circumstances of their

birth." *Id.* at 34.   Plaintiffs assert both facial and as-applied challenges to the policy.   In their Motion, Plaintiffs seek summary judgment only on their facial challenges.

Here, based on the less stringent residency requirements in the INA for children of married couples, the ability to confer citizenship on children falls within the "constellation of benefits that the State has linked to marriage." *Obergefell*, 135 S. Ct. at 2601.   The fact that, under the State Department's interpretation, a male same-sex married couple can never have a child deemed to be born in wedlock and receive the citizenship-related benefit associated with having such a marital child alone raises "serious . . . doubts" whether it infringes on that fundamental right. *Jennings*, 138 S. Ct. at 836.   The State Department nevertheless argues that there are no plausible constitutional claims because the policy of requiring biological relationships with both parents in order for a child to be "born . . . of" those parents or to have been born in wedlock is applied evenhandedly, against both same-sex and opposite-sex couples alike.   Under the State Department's interpretation, however, "[c]hildren born in wedlock are generally presumed to be the issue of the marriage," 8 FAM § 301.4-1(D)(1)(d), and will therefore be deemed born of both parents absent circumstances that give rise to a question about the biological relationship between a husband and the child.   The relevant State Department form to be completed states that "[o]nly the U.S. citizen father of a child born abroad out of wedlock must complete the acknowledgment of paternity," such that the necessary implication of the State Department's interpretation is that a married father need not prove a biological relationship in the ordinary course.   J.R. 249.   The relevant form does not specifically ask a parent whether he or she has a biological relationship with the child and instead asks only whether the parent was "married to the child's other biological parent when the child was born."   J.R. 248.   Thus, on its face, some, if not most, opposite-sex couples will be permitted to confer citizenship on their child under § 1401(c) without any proof of

a biological relationship, while no male same-sex couple could ever have a child in wedlock who could qualify for citizenship under § 1401(c).

Furthermore, Peek, the Bureau of Consular Affairs official, testified in his deposition that it is "uncommon" to require DNA testing to establish a biological relationship, and "much more common" in cases involving ART, which reveals that even when ART is used, proof of a biological relationship is not always required.  J.R. 137.   Where the State Department effectively has acknowledged that it applies § 1401(c) in certain cases without ever requiring proof of a biological relationship, its interpretation appears to advantage certain opposite-sex couples as compared to same-sex couples in providing a benefit related to marriage. *See Pavan*, 137 S. Ct. 2075 (finding unconstitutional a state law and practice of including the name of the mother's male spouse on the child's birth certificate but not including the name of a mother's female spouse).   It is not immediately clear why such disparate treatment would be constitutionally justified at least in the present case, where it is undisputed that there is a biological relationship between one U.S. citizen parent and the child, and where, under the State Department's position that gestational surrogates and sperm or egg donors do not count as parents for purposes of citizenship analysis, 100 percent of the biological parents are U.S. citizens.

Under these circumstances, although a determination of the constitutionality of the State Department's policy cannot be made without additional analysis, Plaintiffs have, at a minimum, established that the State Department's interpretation of the statute would raise "serious constitutional doubts" warranting application of the canon of constitutional avoidance. *Clark*, 543 U.S. at 381.  If the canon were applied, it would favor Plaintiffs' interpretation, which avoids a likely conflict with constitutional principles by more easily permitting equal treatment of same-sex male couples, particularly by allowing them to have a child in wedlock.  Thus, although not

necessary to the Court's conclusion, the canon of constitutional avoidance would provide an additional basis to support it.

Accordingly, the Court concludes that the State Department's application of § 1409 and § 1401(g) to K.R.K.'s application was incorrect. Under the correct provision, § 1401(c), K.R.K. was born of married parents who were both U.S. citizens who had resided in the United States before her birth. K.R.K. is thus a U.S. citizen by birth. The Court will therefore grant summary judgment to Plaintiffs based on their claim under 8 U.S.C. § 1503. As acknowledged by Plaintiffs at the hearing on the Motions, having granted Plaintiffs' Motion on this basis, the Court need not address and resolve the constitutional claims on the merits.

## IV.   APA

In addition to their claim under 8 U.S.C. § 1503, Plaintiffs have asserted an APA claim, arguing that the State Department's conduct was "arbitrary and capricious," "contrary to law and in excess of its authority delegated by Congress." Am. Compl. ¶ 98, ECF No. 45. The State Department moves to dismiss this claim on the grounds that Plaintiffs may not bring an APA claim because they have another avenue through which to obtain the proposed relief.

The APA provides for judicial review of a final agency action only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. This provision precludes APA review where Congress has provided a "special and adequate review procedure." *Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988); *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009). Significantly, this "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia*, 563 F.3d at 522 (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1272 (D.C. Cir. 2005)).

Here, there is such an alternative remedy: 8 U.S.C. § 1503. The legal wrong on which Plaintiffs base their APA claim—"the State Department's erroneous finding that K.R.K. is not a U.S. citizen and its related decision to deny the passport application submitted on K.R.K.'s behalf," Am. Compl. ¶ 89—is just the sort of wrong that § 1503 is designed to rectify. *See* 8 U.S.C. § 1503(a) ("If any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege . . . upon the ground that he is not a national of the United States, such person may institute an action . . . ."). Indeed, when plaintiffs challenge the State Department's "deprivation of U.S. passports on the allegedly erroneous conclusion that they are not citizens," courts have consistently concluded that § 1503(a) provides "an adequate alternative remedy" to APA review. *Hinojosa v. Horn*, 896 F.3d 305, 312 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1319 (2019); *Dvash-Banks*, 2019 WL 911799, at \*5 (collecting cases).

Plaintiffs argue that their APA claim can provide them with "additional relief beyond that provided by Section 1503(a)." Mot. Summ. J. at 37. In particular, they seek an order setting aside the State Department's policy requiring two biological relationships to deem a child born in wedlock and to apply § 1401(c). Here, the State Department has acknowledged, without providing any persuasive authority supporting its position, that it takes the position that it need not follow the precedent of any United States Court of Appeals on the proper interpretation of § 1401, even when, as here, the passport applicant now resides in the United States and the denial of the passport application occurred at an office within the United States. Under these circumstances, the Court recognizes that a broader injunction would provide a different and likely justifiable form of relief to prevent the State Department from continuing to force individual, similarly situated plaintiffs to expend the time and financial resources to file suit in order to secure citizenship for their child. Such relief, however, would address the interests of other potential plaintiffs, not these Plaintiffs,

and "the general rule" is "that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  Where the declaratory judgment available under 8 U.S.C. § 1503 will provide the relief that Plaintiffs seek, they may not use the APA to seek broader injunctions.  *See Dvash-Banks*, 2019 WL 911799, at *6.  Consequently, the Court will grant the State Department's Motion to Dismiss on this claim.

## CONCLUSION

For the foregoing reasons, the State Department's Motion to Dismiss will be GRANTED IN PART and DENIED IN PART.  It will be granted as to the APA claim and otherwise denied. Plaintiffs' Partial Motion for Summary Judgment will be GRANTED, and a declaratory judgment that K.R.K. is a U.S. citizen by birth will be entered in favor of Plaintiffs.  A separate Order shall issue.

Date:  June 17, 2020                                 /s/ *Theodore D. Chuang*
                                                    THEODORE D. CHUANG
                                                    United States District Judge